ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of --                          )
                                       )
RBC Construction Corp.                 )     ASBCA Nos. 59404, 59962, 60050
                                       )                 60277, 60851
                                       )
Under Contract No. W912QR-11-C-0046    )

APPEARANCES FOR THE APPELLANT:         Brian S. Wood, Esq.
                                       Sarah K. Carpenter, Esq.
                                         Smith, Currie & Hancock LLP
                                         Washington, DC

APPEARANCES FOR THE GOVERNMENT:        Michael P. Goodman, Esq.
                                         Engineer Chief Trial Attorney
                                       Carlton A. Arnold, Esq.
                                       Nicole E. Angst, Esq.
                                         Engineer Trial Attorneys
                                         U.S. Army Engineer District, Louisville

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

        Appellant, RBC Construction Corporation (RBC), was awarded a contract by
respondent, the United States Army Corps of Engineers (USACE or government) for
the construction of four structures at an Army Reserve base in greater San Juan,
Puerto Rico.  RBC appeals from a series of contracting officer final decisions
stemming from alleged contractual changes and government-caused delays.
Specifically, RBC alleges additional costs and delays related to the government's
design review, the discovery of asbestos on the project site, and a building layout
change (ASBCA No. 59404); a purported contractual change related to the provision
of kitchen equipment (ASBCA No. 59962); the government's failure to process RBC's
tax exemption forms (ASBCA No. 60050); review and approval of RBC's standing
seam roofing and built-up roofing submittals (ASBCA No. 60277); and purportedly
additional close-out work (ASBCA No. 60851).

FINDINGS OF FACT

    I.  BACKGROUND

        On September 22, 2011, the Louisville District of the USACE, entered into
Contract No. W912QR-ll-C-0046 (the contract), a design/build contract with RBC,
a company headquartered in San Juan, Puerto Rico.  The contract was for the design
and construction of the Caguas Army Reserve Center located in greater San Juan,

Puerto Rico, in the original lump sum amount of $12,356,390 for the base proposal and option line items No. 0014-0017. (R4, tabs 3-4) The contract provided for the design and construction of four buildings: a training center; an assembly hall; an organizational maintenance shop (OMS); and an unheated storage building (UHS). The buildings were split between two sites, with the training center and assembly hall located on the existing Cpt. Euripides Rubio U.S. Army Reserve Center (also known as the Puerto Nuevo site) in San Juan, PR. The organizational maintenance shop, UHS, and a covered wash bay were located on the existing Fort Buchanan site, located near San Juan, PR. (R4, tab 4 at GR4_316) The Notice to Proceed was received on November 15, 2011, and RBC was to complete the work within 630 calendar days - or by August 6, 2013 (R4, tab 4, tab 5 at GR4_248). RBC filed five separate certified claims pertaining to the contract. We consider the claims in the order that they were appealed to the Board, but address the overlapping delay claims at the conclusion of this opinion.

II. Design Review and Asbestos (ASBCA No. 59404)

The contract contained detailed specifications for the project. "The complete requirements for each submittal are described in the **Army Reserve Design Process and Submittal Requirements Manual – PART C – Design Build – Design Submittal Requirements After Award**" (DPSR) (R4, tab 4 at GR4_1152-53 ¶ 1.3.7) (emphasis in original). "All design submission requirements are defined in the" DPSR and "[a]ll aspects will be followed" (R4, tab 4 at GR4_1161 ¶ 1.7.1) The DPSR "describes development of project detailed designs – the working drawings, specifications and other documents comprising completed project design documents. It applies to the design performed by the successful Design/Build (D/B) contractor after project award." (R4, tab 22 at GR4_2233 ¶ 1.1)

RBC was permitted to use fast track submittals, including specifically site work, under the contract (tr. 1/63, 3/61; R4, tab 4 at GR4_1152 ¶ 1.3.4 ("The contractor shall design and detail a complete and usable facility before construction begins. **Fast track design and construction will be permitted on this project**. Fast-tracking includes site work, ordering long-lead materials, and mobilization.") (emphasis in original)).

The contract also provides that the design submittals for fast track shall include a complete design analysis:

> 1.3.7 The design submittals shall include specifications, drawings, design analysis, CID (FF&E, SID), permit applications, confirmation notices and submittal registers. The government will assist the contractor in finalizing the final draft DD1354, however, it is the Contractor's responsibility to provide. The complete requirements for each submittal are described in the **Army Reserve Design**

2

**Process and Submittal Requirements Manual- PART C – Design Build -- Design Submittal Requirements After Award.** This is referred to below as "DPSR Manual Part C".

(R4, tab 4 at GR4_1152-53) (bold in original) "If fast track design is used, a geotechnical report shall be submitted as part of the first fast track submittal" (R4, tab 4 at GR4_1158 ¶ 1.6.1.3.1).

For projects utilizing fast-track, the contract requires the interim "building site design to include: building area/site layout, final grade elevations, site electrical, mechanical and civil utilities, permits, Design Analyses" (R4, tab 4 at GR4_1162 ¶ 1.7.4).

The purpose of a fast track submittal is to advance some specific work while the normal construction process continues concurrently (tr. 1/64). A portion of the design gets developed and released for work while the remaining design is being completed (tr. 2/103, 3/61, 7/7).

Generally, the design review process would begin with RBC submitting a design submittal to the government. The government would then review the submittal and enter its comments in the "DR checks" computer system. RBC would respond to the government's comments in the DR checks system, and then a meeting would be held to discuss the package. (Tr. 1/67-68; 7/9; R4, tab 22 at GR4_2237-38 ¶¶ 1.6.4.1- 4.2)

Under the Contract, the government had 14 days to review each RBC design submittal (tr. 1/67, 165, 5/134, 202; R4, tab 2 at GR4_30-31 ¶¶ 7.1.5, 7.1.9, tab 10 at GR4_2068 ("Government review periods are 14 calendar days rather than 15 calendar days…")). The government usually gives itself more than 14 days to review submittals (tr. 5/203). Generally, the government agrees to a 30-day government review period for submittals requiring government approval and a 21-day period for government conformance review of other submittals (tr. 5/204-05). According to the government's area engineer for the Project, Luis Rivera, the government "shot [itself] in the feet" by only providing for a 14-day government review period (app. supp. R4, tab 41 at 1).

A. Fire Suppression Water Cistern

The solicitation included preliminary water flow test data to be used by offerors to bid the fire suppression system (R4, tab 4 at GR4_404 ¶ 13.2.2). The contractor was required to perform a water flow test at the project site in accordance with National Fire Protection Association (NFPA) 291 at nearby fire hydrants to determine static pressure, residual pressure, and water flow (R4, tab 4 at GR4_404 ¶ 13.2.3; tr. 7/14).

RBC submitted its site and foundation package, dated February 6, 2012, to the government on February 10, 2012 (tr. 1/65; ASBCA No. 59404 (59404) answer at 3 ¶ 13; R4, tab 12 at GR4_2114). RBC's site and foundation package was a fast track, stand-alone package that was independent of the final design packages for the project (tr. 1/95; app. supp. R4, tab 85 at 1; R4, tab 11 at GR4_2072). During a pre-work conference on November 3-4, 2011, and also during the charrette meeting on December 8-9, 2011, the parties discussed RBC's proposal to use an underground fire suppression water cistern (fire cistern) under the assembly hall building (app. supp. R4, tab 85 at 6-10).

Drawing PS-100, the "General Site Plan – Mechanical Layout," within the site and foundation package showed a 40,000-gallon fire cistern below the assembly hall building (tr. 1/70-71; app. supp. R4, tab 22 at 68). The contract incorporated the DPSR which provided that preliminary hydraulic calculations were to be submitted as part of the interim design package for the project (tr. 1/72, 81-82; R4, tab 22 at GR4_2237 ¶ 1.6.1.2, GR4_2262 ¶ 7.3.1.3(e)).

Government witnesses testified that water storage tanks are typically installed outside the building's footprint where they can be easily accessed and, as such, are not part of a site foundation fast track package, and that the DPSR is written to reflect typical fire protection submissions that are not fast tracked and addressed in an interim design submission (tr. 7/48-50). The government witnesses interpreted the contractual requirement for a complete design submission as requiring RBC to include the cistern in its fast track site and foundation package because the cistern was within the building's footprint, and in order to minimize the potential for any subsequent foundation tear-out (tr. 5/140, 7/49).

On February 23, 2012, government reviewer Julian Donahue opened multiple comments in the DR checks system regarding RBC's site and foundation package, including comment 4446457 requesting the "preliminary calculations that detail sizing" for the fire cistern shown below the assembly hall building (tr. 1/68-70; R4, tab 13 at GR4_2204). In response to Mr. Donahue's comment, on February 28, 2012, RBC's design coordinator, Mr. Patrick J. Balcazar, referred the government to a fire protection calculation table included in a fire protection drawing, FP-103 (tr. 1/73; R4, tab 13 at GR4_2204). The fire cistern was a topic of conversation at a design review meeting held on February 29th and March 1, 2012, between RBC and the government to discuss the site and foundation package (R4, tab 36 at GR4_ 2365; tr. 1/74). The government directed RBC to provide the detailed calculations for the cistern as part of the site and foundation package (tr. 1/74-75).

On March 29, 2012, RBC submitted its corrected final site and foundation package to the government (R4, tab 14 at GR4_2212). As with the earlier submission, the government questioned the fire cistern, in addition to other issues (R4, tab 13

at GR4_2204-07). In response to the government's directive, RBC added preliminary fire protection calculations to plumbing drawing PL-105 in its corrected final site and foundation package (tr. 1/77; app. supp. R4, tab 25 at 74). Plumbing drawing PS-100 within the corrected final site and foundation package called for the same 40,000-gallon fire cistern required by the site and foundation package (app. supp. R4, tab 22 at 68, tab 25 at 68).

On April 20, 2012, Mr. Balcazar commented to Mr. Donahue that PL-105 in its corrected final site and foundation package provided the detailed calculations requested by the government (R4, tab 13 at GR4_2204). On April 23, 2012, Mr. Donahue responded that the calculations provided by RBC did not "provide enough detail to determine if adequate reserve water is provided" and requested additional calculations, including information regarding hazard areas (tr. 1/79; R4, tab 13 at GR4_2204). Mr. Donahue's comment on April 23, 2012, was made 25 calendar days after RBC submitted its corrected final site and foundation package to the government on March 29, 2012 (R4, tab 13 at GR4_2204, tab 14 at GR4_2212).

RBC's building envelope and interim design packages do not appear to be in the record, but they were submitted on or about April 5, 2012 (R4, tabs 26, 41). From April 30, 2012, to May 1, 2012, RBC and the government conducted a design review regarding RBC's building envelope package and interim design package (tr. 1/82; R4, tab 41). The building envelope package was a fast track submittal and the interim design package was a separate design package usually "done in tandem" with the fast track submittals (tr. 7/7, 41-42).

In its review of RBC's building envelope and interim design packages, the government raised the same issues regarding the fire cistern that it raised in its review of the site and foundation package (tr. 1/86; R4, tab 41 at GR4_2428, item O, GR4_2435, item II, GR4_2436, item V). While discussing the interim design package with RBC, the government explained that it wanted the preliminary calculations to "ensure you [RBC] are on the right track. So if there is a need of a final adjustment you [RBC] do it on time, before the final submittal" (R4, tab 41 at GR4_2436).

On May 14, 2012, Mr. Juan Bertran, RBC's fire protection contractor, provided RBC the data for the hydrant flow test he conducted at the Puerto Nuevo site on May 6, 2012 (app. supp. R4, tab 124). Mr. Bertran's flow test data supplemented the flow test data contained in the contract, based on a flow test at the Puerto Nuevo site around April 2011 (tr. 7/46; R4, tab 4 at GR4_521). On May 17, 2012, Mr. Balcazar submitted this flow test data to the government through the DR checks system (tr. 1/88-89; R4, tab 13 at GR4_2204).

On May 18, 2012, RBC submitted a request for information (RFI) to the government regarding the fire cistern capacity and attached the flow test results to the RFI. RBC also provided hydraulic calculations, prepared by Mr. Jose Marrero, the

Mechanical Engineer of Record for RBC's Designer of Record, Harvard Jolly, confirming that a 40,000-gallon cistern complied with Unified Facilities Criteria (UFC) and contractual requirements. (Tr. 2/9, 15; app. supp. R4, tab 89) RBC indicated that the 40,000-gallon cistern complied with ¶ 3-4.2 Reduction in Storage Capacity of the UFC 3-600-01, which permits a reduction in storage capacity if an adequate replenishment source is available (tr. 2/16-17; app. supp. R4, tab 37 at 34 ¶ 3-4.2).

On May 23, 2012, the government responded to RBC's RFI requiring RBC to resubmit its hydraulic calculations (app. supp. R4, tab 89 at 3). On May 24, 2012, Mr. Donahue entered into the DR checks system, the same response the government provided to RBC's RFI (R4, tab 13 at GR4_2205). Through this point, the fire cistern was just one of the open issues in the DR checks system (R4, tab 13). On June 1, 2012, the government closed its comment regarding drainage issues, leaving the fire cistern as the only open comment preventing approval of the site and foundation package (R4, tab 13 at GR4_2173). RBC's expert, Mr. Mark Doran, stated, without citation to the record, that the government's failure to close out comments in the DR checks system delayed RBC's submissions (app. supp. R4, tab 118 at 14). To the extent Mr. Doran was alleging that the government failed to close out comments after the government was satisfied with RBC's responses, we did not see evidence of this in the record and find that any government delay was concurrent with RBC delay through June 1, 2012.

On June 5, 2012, Mr. Balcazar submitted fire protection drawings and calculations to the government, which specifically included hazard area classifications (R4, tab 13 at GR4_2205-06). On June 7, 2012, a new government reviewer, Mark Robertson responded to Mr. Balcazar's comments in the DR checks system asserting that the 40,000-gallon cistern proposed by RBC would result in "7,866.2 gallons short of demand required for 90 minutes of fire protection water supply as required by UFC 3-600-01" (R4, tab 13 at GR4_2206). Mr. Robertson and Mr. Balcazar continued to exchange comments regarding the fire cistern calculations between June 7, 2012, and June 19, 2012, when Mr. Balcazar submitted a clean set of drawings without design changes (R4, tab 13 at GR4_2207). On June 21, 2012, 119 calendar days after the government's first comment in the DR checks system regarding the 40,000-gallon cistern proposed for the assembly hall building, the government closed comment 4446457 (R4, tab 13 at GR4_2207). On July 30, 2012, RBC submitted its certified final site and foundation package to the government, containing a 40,000-gallon fire cistern as originally proposed in its site and foundation package (app. supp. R4, tab 26; R4, tab 256).

B. Training Building Facade

The government began discussions with RBC in December 2011 for the design of a new entrance on the south side of the training building that would essentially mirror the front entrance (R4, tab 262). The change was discussed at the charrette meeting on December 8-9, 2011, and again on February 2, 2012. By letter

RBC-009-CPN-H-007, RBC provided a rough order of magnitude for this item of approximately $25,000 (R4, tab 20 at GR4_2222, item 5).  The government issued a Request for Proposal (RFP) on May 16, 2012, for changes to the training building facade (R4, tab 23).  RBC responded to the RFP on May 29, 2012, with an estimate of $236,503.22, and requested extended overhead for 35 days (R4, tab 24 at GR4_2299, 2303).  Following discussions, the government issued unilateral modification A00005, which was signed on December 6, 2012, in the amount of $42,638.45 and no additional time (R4, tab 25).

RBC had been provided a release for construction of the certified site foundation on July 23, 2012 (R4, tab 17).  RBC asserts that it's certified site foundation design and its 50% interim design packages were delayed by the issuance of the modification for the training building facade (tr. 1/180).  However, RBC submitted its certified site foundation design and its 50% interim design packages five months before the modification was issued (tr. 5/120-21).  The interim 50% design and building shell packages were submitted on April 5, 2012 (R4, tab 26).  Release for construction and RBC's certified site/foundation package was accepted and issued on July 23, 2012 (R4, tab 17).

C.  Asbestos Removal

The contract required RBC to locate underground storage tanks and their related piping as per Drawings C-2 and C-3 (R4, tab 62 at GR4_2664 ¶ 1.7.4.5).  On September 13, 2012, after the start of construction, RBC discovered two underground pipes possibly containing asbestos (tr. 1/57-58, 3/67; 59404 answer at 6 ¶ 18).  Initially, RBC believed the pipes at issue to be abandoned electrical lines, because on November 4, 2011, the government provided a report to RBC that identified the pipes as electrical lines (59404 answer at 7 ¶ 23).  Additionally, drawings provided by the government as part of the contract showed only lines running under the construction area and existing buildings (R4, tab 4 at GR4_939-45, app'x K).  RBC did not intend to remove what it believed to be abandoned electrical lines.  The contract only required RBC to "locate each of the existing underground storage tanks (USTs) and related piping…" and to "avoid the USTs."  (R4, tab 4 at GR4_324-25 ¶¶ 1.7.4.5-4.6)  However, upon discovering that the lines were fuel pipes containing asbestos, as will be explained below, RBC had to remove the 2 pipes (tr. 5/8-9; app. supp. R4, tab 6 at 7 ¶ 23).

On October 4, 2012, RBC notified the government in writing of its discovery of two pipes possibly containing hazardous material or asbestos (R4, tab 66 at GR4_2683).  The discovery of the asbestos was unexpected (tr. 5/8).  Upon the suspected discovery of hazardous material on the project, the contract required RBC to "immediately stop work in the affected area, notify the Contracting Officer, and await Contracting Officer's

direction before proceeding with additional work in the area" (R4, tab 4 at GR4_323-24 ¶ 1.7.3). RBC stopped work due to the presence of the asbestos (app. supp. R4, tab 20 at 9, 11, 13, 15-16, tab 81 at 1 (e-mail from Janice Rivera dated November 14, 2012, stating "please keep in mind that the contractor is doing minimal work right now."); tab 82 at 1 (e-mail from Janice Rivera dated November 30, 2012, stating "right now [RBC] can't do too much in the field due to the pipes [containing asbestos].")). The government's expert witness, Mr. Stuart Ockman, indicated in his expert report that RBC continued backfilling operations at the training building site until October 18, 2012, when it suspended operations due to suspected asbestos. (R4, tab 285 at GR4_7403-04; tr. 7/165). However, RBC's expert, Mr. Doran, indicated that RBC planned to perform the backfill at the assembly building before performing backfill at the training building. Mr. Doran indicated that the backfill performed between October 3, 2012 and October 18, 2012, was performed out of sequence and was inefficient work. (App. supp. R4, tab 118 at 21; tr. 2/216)

On October 24, 2012, the government issued contract amendment 4, for RBC to test the pipes for asbestos (59404 answer at 7 ¶ 20; tr. 3/66-67; R4, tab 63). On November 20, 2012, the government issued unilateral modification A00006 to increase the contract in the amount of $25,000 as part 1, notice to proceed with the asbestos removal, and provided direction for RBC to obtain environmental permits (R4, tab 64). However, RBC's project Manager Mr. Diaz testified that it could not apply for the permits until resolving the scope of the abatement work, including whether the pipes needed to be flushed to remove fuel residue before disposing of the asbestos-contaminated pipe (tr. 3/68-69).

On December 3, 2012, RBC submitted its proposal for removal of the asbestos-contaminated pipes (59404 answer at 7 ¶ 21). On December 20, 2012, the government issued contract amendment 7, which was signed by RBC on December 26, 2012, for removal of the asbestos pipes. Amendment 7 increased the contract amount by $14,862.89 and 0 calendar days. (R4, tab 65) Removing asbestos unexpectedly discovered on a project is not a quick process (tr. 1/59-60). When asbestos is not anticipated on a project, it can take the contractor longer to arrange the appropriate subcontractors. RBC presented testimony from Mr. Balcazar, that, in his experience, it could take approximately 12 to 18 weeks to obtain permitting and safely remove the asbestos (tr. 1/60). RBC's expert witness, Mr. Mark Doran further testified that the time necessary to arrange asbestos remediation depends, in part, on whether asbestos is anticipated on a project (tr. 2/144-45). On projects where asbestos problems are anticipated, the contractor may have already identified an asbestos abatement contractor (tr. 2/145). Ms. Rivera testified for the government that, in her experience, contractors are normally able to retain and mobilize an asbestos subcontractor within

10 to 15 days (tr. 5/73). However, Ms. Rivera was unable to clarify whether her experience involved projects where asbestos was anticipated (tr. 6/86-87).

Prior to beginning of the asbestos removal, RBC was required to submit a work plan with a defined scope of work to the Environmental Quality Board for approval (tr. 3/68-69). RBC contends that the environmental board was closed for the end of year holidays when RBC received Amendment 7, and it could not submit its work plan to the board until after the January 6 Three Kings Day holiday (also known as the Epiphany) (tr. 3/69-70). The government disputes that the environmental board closed for the holidays (tr. 5/75). However, Ms. Rivera conceded that, although the office remained open, there might be reduced staffing (tr. 5/154). By January 17, 2013, RBC had obtained its environmental permit and hired an asbestos remediation contractor (tr. 5/73). On January 24, 2013, RBC completed the removal of the pipes (R4, tab 285 at GR4_7404-05).

On June 12, 2013, by letter CPN-C-0055, the government found that "the delay claimed by you [RBC] for the asbestos in the fuel lines has some merit" and proposed a contractual modification for 102 non-compensable calendar days caused by the removal of the asbestos (R4, tab 66 at GR4_2683). On October 18, 2013, the government issued a modification, amendment 11, to the contract under the changes clause for a 102 non-compensable calendar day extension, from October 18, 2012, to January 28, 2013 (app. supp. R4, tab 13 at 19-21; R4, tab 66 at GR4_2683). The government acknowledged that RBC provided formal notice of the hazardous condition on October 4, 2012, and RBC was not able to "go back to work on the tasks in the original contract" until January 28, 2013, a time period of 116 calendar days (R4, tab 66 at GR4_2683). However, the government claimed October 18, 2013, as the "actual delay start date" because the contract permits the government up to 14 calendar days to investigate the hazardous condition (*id.*; R4, tab 4 at GR4_1244-45 ¶ 3.1.3). The contract does not state that the 14-day government investigation period will be deducted from the duration of any delay caused by a hazardous condition (R4, tab 4 at GR4_1244-45 ¶ 3.1.3).

D. OMS Building Change

The tool room in the OMS building was not required by the contract to be adjacent to the work bay (tr. 5/24-25, 122; R4, tab 4 at GR4_317 ¶ 1.2.4.3 ("The diagrammatic drawings indicate typical adjacencies, they are not indicated to dictate the final layout for the project."); tab 74 (adjacency drawing, A-001 showing work bay and tool room as "typically adjacent to each other.")). On March 19, 2013, upon noticing that the design did not require the tool room to be adjacent to the work bay in the OMS building, a representative for the end-user of the project requested that the two rooms be adjacent, and the USACE subsequently issued a RFP for the change (tr. 5/121-23). On June 11-12, and 21, 2013, RBC poured the concrete OMS floor slab (tr. 6/146-47, R4, tab 289).

9

On June 27, 2013, by letter CPN-C-0056 and pursuant to the contract changes clause, the government requested that RBC submit a proposal for changes to the interior layout of the rooms in the OMS building (tr. 3/85; R4, tab 75). The government directive resulted in a "shuffle" of other rooms, such as the bathroom and kitchen (tr. 4/178). On August 26, 2013, RBC submitted its proposal for the government requested change to the OMS building layout (R4, tab 77). At the time of the proposal, RBC had already poured its floor slab, had erected some of the roof, but had not begun working on the interior of the building (tr. 6/148). The proposed change did not affect the water, sanitary plumbing, or electrical lines (tr. 5/ 124, 6/146-47).

On October 15, 2013, RBC advised Administrative Contracting Officer (ACO) McQuary that because RBC had not received a modification to the contract for the OMS building layout change, RBC was required to proceed with the work as originally designed and advised the government that some work may need to be demolished if a modification is later issued (tr. 3/88; app. supp. R4, tab 75 at 1).

On October 16, 2013, the government issued a modification to the contract, amendment 10, for the OMS building layout change in the amount of $59,939.99 and zero calendar days (R4, tab 127). RBC contends that from approximately the time the government requested the change to the time it issued amendment 10, the OMS building was on the critical path[1] (app. supp. R4 tab 20 at 29, 31, 33, 35, 37, 39-41, 45, tab 45 at 2). The government did not approve the revised design for the OMS building interior work until January 17, 2014 (app. supp. R4, tab 117 at 14). RBC's interior subcontractor, Cordex, did not report to the site until December 10, 2013. Upon arrival, Cordex started work on the OMS building roof eaves. (R4, tab 281 at GR4_7360) Mr. Doran, in discussing delays to the OMS building roof, states that interior work did not begin prior to February 25, 2014 (app. supp. R4, tab 117 at 16). RBC contends that the OMS interior building work was delayed until January 18, 2014, because all OMS interior work was constructively stopped until the redesign was approved by the government (app. supp. R4, tab 117 at 15). The government contends that time was not granted because the OMS building was not on the critical path, and due to RBC's late design, no work was being performed in the OMS interior (tr. 6/239, 8/16, 41, 44; R4, tab 285 at GR4_7413, 7420).

_____

[1] "The critical path is the longest path through the schedule. For any delay to the critical path, there is a corresponding delay to project completion. Activities which are on the critical path have no float; that is, the early and late start dates and the early and late finish dates are identical." *Donohoe Constr. Co.*, ASBCA No. 47310 *et al.*, 98-2 BCA ¶ 30,076 at 148,811.

E.  Delay

RBC's delay allegations in its claim docketed as ASBCA No. 59404 simply repeat the alleged delays discussed above, recognize some concurrency between claimed delays, and assert daily delay costs that are not relevant to this decision on entitlement (R4, tab 6).

DECISION ASBCA No. 59404

RBC's first appeal asserts delays purportedly caused by the government's review of RBC's design submissions primarily with regard to a fire cistern incorporated into the design of the assembly hall building and the discovery of asbestos coating on an underground fuel line.  The appeal also alleges delays related to a change in the facade of the training building and changes to the room layout of the operation and maintenance building.  Here, we address only issues of contract interpretation regarding entitlement for the asserted delays.  Whether the delays are compensable is addressed at the end of the decision.

A.  Fire Cistern

As detailed above, the project permitted the use of fast track design methods (R4, tab 4 at GR4_1152 ¶ 1.3.4).  Additionally, the DPSR Part C, provides that preliminary hydraulic calculations are required in the interim design but not as part of the charrette design (R4, tab 22 at GR4_2260-62).  Thus, RBC asserts that the government's insistence that RBC include hydraulic calculations in its fast-track site and foundation package constitutes a constructive change to the contract (app. br. at 8-9).  The government contends that RBC's decision to include the fire cistern in the foundation of the building, rather than using an external tank, required RBC to include the fire suppression calculations in the site and foundation package.  The government relies upon a statement in ¶ 1.3.7 of the contract that "[t]he design submittals shall include specifications, drawings, design analysis, CID (FF&E, SID), permit applications, confirmation notices and submittal registers" (R4, tab 4 at GR4_1152) as requiring RBC to include the hydraulic calculations in the site and foundation package.  According to the government's interpretation, the calculations are normally required in the interim design submission, but once RBC included the cistern in the building footprint, it was required to include the hydraulic calculations in the site and foundation package in order to present a complete design analysis (gov't br. at 36-37).

The government cites selectively to ¶ 1.3.7, because the same section of the contact additionally provides that "[t]he complete requirements for each submittal are described in the **Army Reserve Design Process and Submittal Requirements Manual – Part C – Design Build – Design Submittal Requirements After Award**" (R4, tab 4 at GR4_1152-53) (emphasis in original).  Thus, the government, in arguing that the contract required RBC to include the hydraulic calculations in the site and

11

foundation package, relies upon a section of the contract that cites as the "complete requirements" a document that expressly provides that the hydraulic calculations are not required until the interim design.

To be fair, the government's position is eminently reasonable. External fire cisterns can easily be modified at a later stage of construction. If RBC had under-sized the fire cistern in its fast-track submission, it could be expensive and time-consuming to modify the foundation. However well-intentioned the government's actions were in attempting to save RBC from itself, the contract did not require RBC to submit the fire cistern calculations as part of its site and foundation submission, and the government's decision to delay approval of the site and foundation package until the fire cistern was approved delayed RBC's site and foundation work. The government's argument that the fire cistern sizing was required by the contract is true but irrelevant (gov't resp. br. at 37). RBC seeks delay damages and not damages for additional work not required by the contract. Under the fast-track procedure, RBC could have started site work at an earlier date if the government followed the contractual requirements and reviewed the fire cistern as part of the interim design package.

While we find that RBC was delayed, we also find that it's claimed delay is overstated. RBC asserts that the entire period from submission of its site and foundation package until approval was a compensable delay. However, the fire cistern was not the only problem with RBC's site and foundation package. The government identified numerous deficiencies requiring resubmission (*see*, *e.g*., R4, tab 13 at GR4_2133, 2141, 2173). The last of these problems, an issue pertaining to drainage, was not resolved until June 1, 2012 (R4, tab 13 at GR4_2173). Thus, we find that any delay prior to June 1, 2012 (other than government delay in responding to submissions, addressed below) was concurrent with delays that were RBC's responsibility. *See*, *e.g*., *William F. Klingensmith*, *Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984).

Additionally, we hold that the government delayed RBC by 11 days due to its delay in reviewing RBC's corrected site and foundation package. RBC submitted the package to the government on March 29, 2012 (R4, tab 13 at GR4_2204, tab 14 at GR4_2212), but the government did not provide its comments until April 23, 2012 – 25 days later, or 11 days more than the 14 days allowed the government by the contract. *See*, *e.g*., *ADT Constr. Grp. Inc.*, ASBCA No. 55307, 09-2 BCA ¶ 34,200 at 169,085. Accordingly, we hold that RBC was delayed from February 24, 2012, until April 12, 2012 (49 days), concurrent with RBC delays. RBC was additionally delayed April 13, 2012, to April 23, 2012 (11 days) by the government's delay in reviewing RBC's submission. RBC was again concurrently delayed from April 24, 2012 to June 1, 2012 (39 days) and was delayed from June 2 to June 21, 2012 (20 days), by the government's requirement that RBC address the fire cistern in its site and foundation package. We address whether the delays were compensable at the end of this decision.

B.  Training Building Facade

RBC did not address its claim pertaining to the training building facade in its post-hearing brief.  Accordingly, the claim is waived.  *See*, *Engineering Solutions & Products*, *LLC*, ASBCA No. 58633, 17-1 BCA ¶ 36,822 at 179,470; *cf. Watts Constructors LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,387; *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 at 1319 (Fed. Cir. 2006).  Moreover, we note that the government demonstrated that RBC had already submitted its certified site foundation design and its 50% interim design packages, the packages RBC alleges were delayed before the training building facade modification was issued (tr. 5/120-21).

C.  Asbestos

RBC asserts entitlement to 116 days of compensable delay (app. br. at 16).  The government granted RBC 102 days of non-compensable delay in a contract modification, based on the 116 days claimed by RBC, but deducting 14 days for the government to review the information.  However, the government now contends that its award of 102 days was in error and that RBC is entitled to only 47 days of delay (gov't resp. br. at 32-36).

The resolution of this portion of RBC's appeal requires that we determine how long it should have reasonably taken RBC to arrange for an environmental remediation subcontractor.  The parties do not dispute that RBC was required to stop work when it discovered the possible existence of asbestos and that it could not start work again until after the government issued the notice to proceed on the remediation work (gov't resp. br. at 32-33).  The government contends that RBC was not delayed until October 18, 2012, when it stopped backfilling at the training building (R4, tab 285 at GR4_7403-04; tr. 7/165).  However, we find Mr. Doran's testimony credible that this work was being performed out of sequence and was inefficient (app. supp. R4, tab 118 at 21).  We find that RBC was delayed beginning on October 4, 2012.

RBC presented the testimony of Mr. Balcazar that it could take 12 to 18 weeks from the discovery of the asbestos to identify a subcontractor, obtain the necessary permits, and to remove the asbestos (tr. 1/60).  Mr. Doran further testified that the time necessary to arrange asbestos remediation depends in part on whether asbestos is anticipated on a project (tr. 2/144-45).  On projects where asbestos problems are anticipated, the contractor may already have identified an asbestos abatement contractor (*id.*).  The government relies upon the testimony of Ms. Rivera that, in her experience, contractors are normally able to retain and mobilize an asbestos subcontractor within 10 to 15 days (tr. 5/73).  However, Ms. Rivera was unable to clarify whether her experience involved projects where asbestos was anticipated (tr. 6/86-87).  We find Mr. Balcazar's testimony to be more probative than Ms. Rivera's experience in observing contractors retaining abatement subcontractors, and also find that Ms. Rivera's testimony conflicts with her earlier finding that there was merit to RBC's claim and awarding

13

102 non-compensable days of delay (R4, tab 90). Thus, we find that RBC was delayed beginning on October 4, 2012, and that RBC was not expected to retain an asbestos abatement subcontractor within 10 to 15 days.

The government issued its notice to proceed to RBC on November 20, 2012, however, RBC could not apply for the necessary permits until it received amendment 7, signed by the Corps just before Christmas and by RBC on December 26, 2012. RBC did not retain its subcontractor until January 17, 2013. RBC contends that this delay was due to the government of Puerto Rico closing for the holidays, through Three Kings Day on January 6, 2013, a point that the government disputes. Neither party submitted any official documentation of the Puerto Rican government's holiday schedule. We find that RBC's testimony is preponderant, especially given Ms. Rivera's prior modification to the contract finding that RBC had been delayed during this period, and her concession that there was probably reduced staffing at the Puerto Rican environmental office over the holidays (R4, tab 66; tr. 5/154). While the Puerto Rican environmental office may have been open to accept RBC's submission, we find it more likely than not, that consideration of RBC's application would have been delayed until after the holiday. Accordingly, we find that RBC was delayed for 116 days, from October 4, 2012, to January 27, 2013. Once again, we will address whether the delays are compensable at the end of this decision.

D. OMS Building Change

RBC asserts that it was delayed by 194 days, from early July 2013 through January 18, 2014,[2] due to the government's request to change the layout of the OMS building to have the tool room adjacent to the work bay (app. br. at 29-31). According to RBC, the design change further held-up the progress of interior work in the building.[3] The government asserts that RBC was not delayed in its OMS building interior work because it had not "dried-in" the OMS building before the government issued the design modification (gov't resp. br. at 41-42). According to the government, RBC could not have begun interior work prior to January 18, 2014 because it had not completed work on the roof and exterior of the building. Project records indicate that RBC's interior subcontractor, Cordex, did not report to the site until December 10, 2013, and they started work on the OMS building roof eaves (R4, tab 281 at GR4_7360). Mr. Doran further indicates that interior work did not begin prior to February 25, 2014 (app. supp. R4, tab 117 at 16). Thus, we find that the

---

[2] RBC's proposed findings of fact asserts delay through January 17, 2014 (app. proposed findings of fact ¶ 263). The actual number of days between July 10, 2013 and January 17, or 18, 2014 is 191 or 192.

[3] The government presents a straw-man argument that RBC was alleging delay because it could not pour the concrete pad; however, this allegation does not appear in RBC's claim (R4, tabs 6, 9).

14

government's interior changes did not delay the completion of performance.  More simply put, the building had not been dried-in when the government modified the layout of the building.  RBC could not have begun interior work prior to drying-in the building, so the change did not extend RBC's performance.  RBC was not in a position to perform interior work prior to the government's Modification No. 10 in October 2013.  In fact, its interior subcontractor was not on-site for nearly two months after the modification.  RBC conceivably could have been delayed by the government's failure to approve the modification until January 17, 2014; however, RBC has not established that it was ready to perform interior work prior to that date.  Moreover, RBC does not allege that it had to perform any rework to the concrete pad or utilities as a result of the layout modification.  At best, it alleges that it started interior work sometime in February, or up to a month and a half after approval of the revised plans.

### E.  Delay

As noted above, we find that RBC has established that it was delayed by 119 days for the fire cistern, of which 88 days were concurrent with RBC-caused delays and 116 days of delay for the asbestos claim.  We address whether these days were on the critical path and are compensable at the end of this decision.  Appeal ASBCA No. 59404 is sustained in part.

### III.  Kitchen Equipment (ASBCA No. 59962)

The design of the assembly hall building included a kitchen.  The primary purpose of the kitchen was to prepare meals for the soldiers and, per the terms of the contract, was to be designed and equipped to meet the training mission of the cooks who prepared the food (app. supp. R4, tab 38 at 16 ¶¶ 1-6.3.1, tab 113 ¶ 4.2.11.1).  To facilitate its training mission the kitchen equipment was standardized with the list of equipment set forth in the Unified Facilities Criteria Guide so that cooks learning to prepare meals would be able to use the same equipment regardless of their mission location (tr. 5/36-37).

The scope of work specifically contemplates RBC's provision of the design "for furniture and some equipment to be purchased and installed by the Government" (R4, tab 4 at GR4_316 ¶ 1.1.3).  The contract required the delivery of a complete and usable facility, and the contractor was required to "provide all labor, materials, equipment, supplies, permits, fees, and consultant services to design and construct" the facilities (R4, tab 4 at GR4_319 ¶ 1.3.1).  The contract contained a table under the heading "Contractor Responsibility" that clarified which project equipment would be supplied by the government and which equipment would be supplied by the contractor, along with which party was to install the equipment (*id.* at GR4_319-21).  Kitchen equipment is not listed in the table (*id.* at GR4_321).  However, the table indicates that the government will provide items such as furniture and office equipment (*id.*).  In a note to the table, the contract stated:

> For purposes of clarification, this RFP identifies parts of the
> Project for which some responsibility is borne by the
> Government. The responsibility for some work items
> addressed elsewhere in the RFP is brought to the
> Contractor's attention in the following table. *If not identified*
> *as Government-furnished in the table below, or elsewhere,*
> *all work required by the RFP is the responsibility of the*
> *Contractor.*

(R4, tab 4 at GR4_320 ¶ 1.3.3) (emphasis added) The only instance where the contract documents specifically address furnishing or installing any kitchen equipment is within Option B (R4, tab 4 at GR4_71). Option item No. 0013 (Option B) was an option under the Contract to be Operations and Maintenance Army Reserve (OMAR) funded and awarded within 450 days of Contract award. OMAR funded items are considered not to be permanently attached to the construction. Option B listed 18 kitchen equipment items to be furnished and installed by the contractor under the option (R4, tab 4 at GR4_71-72). Although the contract refers to OMAR funds and Military Army Reserve (MCAR) funds, "[t]he funding source has no bearing on the Scope of the Work" (R4, tab 4 at GR4_320 ¶ 1.3.2, tab 99 at SGR4_3103 ¶ C-1.2). Option B was not awarded to RBC (tr. 1/111). Instead, the government provided for the furnishing and installation of the Option B kitchen equipment items (tr. 1/134, 5/40-41).

The UFC design guideline 4-171-05 "contains design criteria and general requirements to be used in the development of designs for new construction and additions/alterations of U.S. Army Reserve (USAR) facilities" (app. supp. R4, tab 38 at 11 ¶ 1-1.1). "The intent of the Guide is to provide a portion of the general information and guidance required for the successful preparation of project designs" (app. supp. R4, tab 38 at 12 ¶ 1-2.2). However, the UFC does not state which party is responsible for furnishing and installing kitchen equipment (tr. 7/83-85).

Appendix E of UFC 4-171-05 provides the standard kitchen plan and equipment list "for inclusion in all Army Reserve training center projects with kitchens" (app. supp. R4, tab 38 at 209 ¶ E-1.1). Paragraph E-1.2 of Appendix E lists 45 kitchen equipment items and strongly advises the "designer…to obtain a copy of the current standard kitchen drawings from the Army Reserve FTP download site..." Appendix E does not specify the party responsible for furnishing or installing the kitchen equipment (app. supp. R4, tab 38 at 209). Many of the kitchen equipment items identified in Appendix E of UFC 4-171-05 are also identified as OMAR kitchen equipment items under Option B of the contract (app. supp. R4, tab 38 at 209-10). The UFC 4-171-05 requires RBC to provide "receptacles or power connections for utilization equipment included in the project as well as equipment furnished by the Government" and specifically identifies kitchen equipment as an item that may be furnished by the government. "Government furnished utilization equipment may

16

include (but is not limited to) computers, fax machines... *kitchen equipment*, computer network equipment…" (app. supp. R4, tab 38 at 82 ¶ 3-10.3.2.12 (emphasis added)).

RJS Barber Associates was hired by RBC's designer of record (DOR), Harvard Jolly, to help with the design and specification of kitchen equipment (tr. 1/130-31). RJS Associates is not a kitchen equipment contractor (tr. 1/183). According to the kitchen equipment schedule drafted by Harvard Jolly, the kitchen equipment contractor (KEC) was required to furnish and install the 45 kitchen equipment items listed in the UFC (R4, tab 101 at SGR4_3110; app. supp. R4, tab 38 at 209-10). The kitchen equipment schedule also addressed items to be furnished and installed by RBC, the general contractor, but did not list the general contractor as furnishing any of the 45 kitchen equipment items (R4, tab 101 at SGR4_3110; app. supp. R4, tab 38 at 209). After it was clear that RBC would not perform Option B, Harvard Jolly revised its kitchen equipment schedule and designated that the 45 UFC kitchen equipment items are being furnished and installed by the "KEC/Government Responsibility." The revised kitchen equipment schedule did not list any of the 45 kitchen equipment items as being furnished by the general contractor (app. supp. R4, tab 38 at 209; R4, tab 107 at SGR4_3390, tab 108 at SGR4_3644, tab 109 at SGR4_3655).

The contract provides that "design products including, but not limited to, plans, specifications, engineering studies and analyses, shop drawings, equipment installation drawings . . . are 'deliverables' under the contract and are not part of the contract itself. Design products must conform with all provisions of the contract, in the order of precedence herein" and government approval of a design submittal does not change the terms of the contract. (Tr. 1/138; R4, tab 4 at GR4_283 ¶ 1.71)

Harvard Jolly's drawing QF-102 Note V provides that: "[t]he general contractor shall be responsible for and shall have included in his scope all work necessary to properly coordinate and facilitate the installation of all food service equipment by the kitchen equipment contractor, including the installation of all related items required" (R4, tab 273; tr. 4/33). RBC's designer of record, Mr. Steve Heiser, of Harvard Jolly, testified that Harvard Jolly had identified the party furnishing and installing the kitchen equipment as the kitchen equipment contractor as opposed to the general contractor based upon his experience in the industry that kitchen equipment is generally furnished and installed by a specialized food contractor (tr. 4/31).[4] Mr. Heiser testified that RBC's food service specification consultant, RJS/Barber Associates, prepared written food service equipment specifications, issued for

---

[4] We credit Mr. Heiser's statements based upon his personal knowledge of Harvard Jolly's work on this contract, but, as discussed below, we do not credit his testimony regarding contractual interpretation.

construction, dated March 12, 2012, which also identified the KEC as furnishing and installing the specified equipment (tr. 4/34-35; R4, tab 101 at GR4_3112-14).

RJS/Barber's written kitchen food service equipment specifications that were issued with its interim design submittal, states: Part I General para. 1.01, "[w]ork includes, but is not necessarily limited to, the following" "K.E.C. shall include all labor, equipment, parts, accessories specified, delivery and freight charges as required, to furnish and set in place all Food Service Equipment specified." (R4, tab 101 at GR4_3113-14). Mr. Heiser testified that the food service equipment specification was issued for construction and was for the purpose of directing RBC's KEC to purchase, furnish, and install all the kitchen equipment that was shown on the interim drawings and written specifications (tr. 4/34-35).

The first time the kitchen equipment was identified as missing was on July 9-10, 2014 during a pre-final inspection (tr. 2/133-34, 3/120-21, 6/55; 59404 *et al*. answer at 3 ¶ 11). The government did not raise the issue of alleged missing kitchen equipment at the pre-final inspection. Instead, a representative for the 81st Reserve Support Command first raised the issue (tr. 6/56-57). The government and RBC exchanged letters following the pre-final inspection regarding the responsible party for providing the kitchen equipment (R4, tabs 110-12).

On August 25, 2014, by letter CPN-C-0078, the government directed RBC to install 26 kitchen equipment items, which consisted of the kitchen equipment items identified in UFC 4-171-05 "with the exception of the work required to furnish and install the equipment items listed in Bid Item 0013 Option B" (R4, tab 112 at SGR4_3671; 59404 *et al*. answer at 3 ¶ 10). On September 10, 2014, RBC agreed to provide the 26 kitchen equipment items, under protest (59404 *et al*. answer at 3 ¶ 12; app. supp. R4, tab 117 at 22-23). Once RBC received the directive to install kitchen equipment, RBC began looking for suppliers and manufacturers to procure the equipment. The equipment was not available in Puerto Rico and had to be shipped from the continental United States. (Tr. 8/141-143) RBC contends that the process of procuring the equipment, fabricating, and getting it delivered to Puerto Rico took approximately 10 weeks (app. proposed finding of fact ¶ 198; tr. 8/142-43).

## DECISION ASBCA No. 59962

RBC seeks recovery of costs incurred in performing what it characterizes as extra work, plus 299 compensable days (app. br. at 37). According to RBC, the contract was ambiguous with regard to which party was to provide the kitchen equipment, and RBC's interpretation, that it was not required to provide the kitchen equipment, should be adopted because it is the only interpretation within the "zone of reasonableness" or based on the rule of *contra proferentem* (app. br. at 31-35). The government asserts that the contract, read as a whole, requires RBC to purchase and install the kitchen equipment (gov't resp. br. at 2-8).

As with any claim involving contract interpretation, we start with the language of the contract. *TEG-Paradigm Envtl.*, *Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). Here, the contract required RBC to "provide all labor, materials, equipment, supplies, permits, fees, and consultant services to design and construct" the facilities (R4, tab 4 at GR4_319 ¶ 1.3.1). The contract additionally contained a table with the heading "Contractor Responsibility" that clarified which project equipment would be supplied by the government and which equipment would be supplied by the contractor, along with which party was to install the equipment (*id.* at GR4_319-21). Kitchen equipment is not listed in the table (*id.* at 321). In a note to the table, the contract states that the "RFP identifies parts of the Project for which some responsibility is borne by the Government" and that if the work is "*not identified as Government-furnished in the table below*, *or elsewhere, all work required by the RFP is the responsibility of the Contractor*" (R4, tab 4 at GR4_320 ¶ 1.3.3) (emphasis added). Thus, by the plain terms of the contract, if the kitchen equipment is required by the contract, it is RBC's responsibility to furnish and install the equipment, unless some other part of the contract provides that the government will furnish the equipment.

We find that the contract, interpreted as a whole, requires the furnishing and installation of the kitchen equipment, both in the contractual language requiring that the contractor "provide all labor, materials, equipment, supplies, permits, fees, and consultant services to design and construct" the project (*id.* at GR4_319 ¶ 1.3.1) and in the UFC document, incorporated into the contract, which contained the standardized equipment list (app. supp. R4, tab 38 at 209). Additionally, we find that no provision of the contract states that the government will furnish the kitchen equipment. In fact, RBC does not dispute that the only contract provision to specifically address furnishing or installing any kitchen equipment is within Option B (R4, tab 4 at GR4_71-72; app. br. at 32). Thus, we hold that the contract required RBC to furnish and install the kitchen equipment.

RBC cites to numerous contractual documents and provisions that do not explicitly state that the contractor is required to furnish and install the kitchen equipment as evidence that the contract is somehow ambiguous (app. br. at 31-35). As explained above, we do not find the contract ambiguous and reject these arguments. *See*, *e.g.*, *ThinkQ*, *Inc.*, ASBCA No. 57732, 13-1 BCA ¶ 35,221 at 172,825 (citing *NVT Technologies*, *Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). Admittedly, here, as in any dispute, more precise contractual language could prevent misunderstandings; however, we find the contractual language to unambiguously require RBC to furnish and install the kitchen equipment. RBC argues that the contract requirements for a complete and usable facility do not mandate provision of kitchen equipment because a complete and usable facility would also require office furniture that RBC was not required to provide (app. reply at 51). However, the contract explicitly listed office furniture as government-provided equipment (R4 tab 4

at GR4_321).  The same table does not require the government to furnish and install kitchen equipment.

RBC additionally relies upon the fact that the final design drawings refer to the kitchen equipment as being "Furnished By" and "Installed By" the KEC and government as proof that it was not RBC's responsibility (app. br. at 34-35).  As explained above, these design drawings initially listed the KEC as responsible for furnishing and installing the equipment (R4, tab 101 at SGR4_3110).  After the government and RBC were unable to reach an agreement with regard to Option B, the government agreed to furnish and install the Option B equipment.  RBC's designer reflected this change by noting that kitchen equipment would be furnished and installed by "KEC/Government" (R4, tab 107 at SGR4_3390).  However, the design drawings, prepared by the contractor, or the contractor's designer, cannot change the terms of the contract.  "Any design products including, but not limited to, plans, specifications, engineering studies and analyses, shop drawings, equipment installation drawings…are 'deliverables' under the contract and are not part of the contract itself.  Design products must conform with all provisions of the contract, in the order of precedence herein" (R4, tab 4 at GR4_283 ¶ 1.71(b)(4)).  Even if the design drawings were relevant, Harvard Jolly's drawing QF-102 Note V provides that: "[t]he general contractor shall be responsible for and shall have included in his scope all work necessary to properly coordinate and facilitate the installation of all food service equipment by the kitchen equipment contractor, including the installation of all related items required" (R4, tab 273 at supp. ex. GR4_7141; tr. 4/33).  Thus, we hold that the contract required RBC to furnish and install the kitchen equipment, and, therefore, that RBC has not established that the government required it to perform work not required by the contract and has not established the existence of a government-caused delay.  Appeal ASBCA No. 59962 is denied.

IV.  Puerto Rico Sales and Use (IVU) Tax (ASBCA No. 60050)

Amendment 4 to the contract, effective July 2011, required bidders to include all taxes in their bids (R4, tab 131 at GR4_4018-19).  RBC submitted its initial proposal on July 21, 2011 with a base proposal price of $12,653,000 (app. supp. R4, tab 15 at 9).  RBC's proposal included a proposed betterment to reduce the contract price by the government providing a "pass-through" tax exemption to local Puerto Rico Sales and Use Tax (Impuesto a las Ventas y Uso or IVU) (app. supp. R4, tab 15 at 35-38).  The betterment noted that RBC's "proposal includes all local taxes as required in Amendment No. 004" but that it could pass-through a savings of approximately $350,000 to the government if the Puerto Rico Form AS2916.1 was accepted by the local authorities (app. supp. R4, tab 15 at 35).

On August 16, 2011, RBC revised its proposal and did not change its base contract price (app. supp. R4, tab 16 at 3).  However, RBC presented testimony that, subsequent to the government asking RBC to revise its proposal price, RBC removed the IVU taxes from its proposal pricing (tr. 3/55).  On September 2, 2011, RBC submitted

20

its final revised proposal, with a revised base contract price of $12,243,000 (R4, tab 130 at GR4_3988-89). RBC did not include any amounts for IVU taxes in the $12,243,000 base contract price proposed in its final revised proposal (tr. 3/56; app. supp. R4, tab 18 at 4, 7). The government awarded the contract to RBC in the amount of $12,356,390 for the base contract (R4, tab 3 at GR4_54).

The contract included clause 52.229-3, FEDERAL, STATE, AND LOCAL TAXES (APR 2003), that, at para. (b), required the inclusion of all Federal, State, local taxes, and duties (R4, tab 4 at GR4_188-89). At paragraph (h), the Federal Acquisition Regulation (FAR) clause provides that the government will "without liability, furnish evidence appropriate to establish exemption from any Federal, State, or local tax when the Contractor requests such evidence and a reasonable basis exists to sustain the exemption" (R4, tab 4 at GR4_189; FAR 52.229-3(h)). The contract also included clause 999.229-1, NOTICE OF FEDERAL, STATE, AND LOCAL TAXES - CONTRACTS PERFORMED IN PUERTO RICO (R4, tab 4 at GR4_118). RBC cites to a November 2006 letter from the Puerto Rico Treasury providing that "all taxable items acquired for the official use of all government agencies and instrumentalities of the Federal Government, are exempt from the sales and use tax of Subtitle BB of the Code" (app. supp. R4, tab 15 at 38).

During the preconstruction meeting held on August 31, 2012, Mr. Balcazar had a conversation with Mr. Castillo, in the presence of Ms. Rivera, concerning RBC obtaining an exemption to the IVU sales tax (tr. 1/53-54; app. supp. R4, tab 84 at 1, 6). As reflected in the meeting minutes, Ms. Rivera agreed that "there will not be a problem" to provide the tax exemption documentation (tr. 3/58; app. supp. R4, tab 84 at 6). However, Ms. Rivera cautioned that some contractors and subcontractors were having problems with the Departamento de Hacienda not accepting the form (app. supp. R4, tab 84 at 6). Ms. Rivera testified for the government that contractors had been experiencing difficulty getting the Puerto Rico Treasury to accept tax exemption forms from the federal government's contractors, and that she informed RBC that the Puerto Rican agencies were not accepting the letter (tr. 5/78-79).

Subsequently, Mr. Castillo executed and provided to RBC tax exemption form AS 2916.1 regarding a February 1, 2013 transaction for materials purchased by RBC for the project (tr. 3/58-59, 5/167; R4, tab 142). Mr. Balcazar testified to his experience, both before and after the project, in obtaining IVU tax exemptions for materials purchased by a contractor for incorporation into a federal project (tr. 1/56-57). Based on Mr. Balcazar's experience, RBC understood that, when a contractor is seeking tax relief, the government verifies the information provided by the contractor, and a document asking for the tax relief is provided to the local authorities (tr. 1/55, 5/176). The tax exemption form executed by Mr. Castillo for the project, form AS 2916.1, is the same form utilized by Mr. Balcazar to successfully obtain exemptions to IVU taxes on other federal projects (tr. 1/57; R4, tab 142 at GR4_4160). Other than the one instance with Mr. Castillo, the government refused to provide RBC IVU exemption documentation

when requested for subsequent purchases of materials for the project (tr. 3/59, 5/173-74, 176-77; ASBCA No. 60050 (60050) answer at 7 ¶ 16). As a result, RBC asserts that it paid $198,546.11 in IVU taxes for materials purchased for the Project (R4, tab 129).

<u>DECISION ASBCA No. 60050</u>

RBC asserts that it is entitled to $198,546.11 in IVU paid for materials used in the project (app. br. at 3-4). RBC bases its argument on FAR 52.229-3(h) which provides that the government will furnish evidence to establish exemption from federal, state, or local taxes when requested by the contractor, and a "reasonable basis exists to sustain the exemption." FAR 52.229-3(h). RBC additionally asserts that the government violated its duty of good faith and fair dealing by refusing to complete the Puerto Rican tax exemption form (app. br. at 4-6). The government relies upon Modification No. 4 of the contract which informed bidders that "[l]ocal Puerto Rico taxes must be included in bid" (gov't resp. br. at 44-46, citing R4, tab 131 at GR4_4019). The government argues that there was no violation of the duty of good faith and fair dealing where the contract required the inclusion of local taxes in the bid (gov't resp. br. at 46-47).

Our precedent makes clear that a contractor cannot obtain an adjustment for state or local taxes that it did not include in its bid, pursuant to FAR 52.229-3. This is true even for later imposed state and local taxes. *See*, *e.g.*, *Professional Services Unified*, *Inc.*, ASBCA No. 48883, 96-1 BCA ¶ 28,073 at 140,180. However, RBC does not seek an adjustment of the contract price as compensation for taxes that it failed to include in its bid; instead, RBC asserts that the government violated FAR 2.229-3(h) by failing to furnish evidence that RBC could use to obtain an IVU tax refund. Just as the contractor is not entitled to an adjustment for state or local taxes not included in its bid, the government is not entitled to an adjustment for state or local taxes not paid by the contractor. *General Dynamics Corp.*, ASBCA No. 49339, 97-2 BCA ¶ 29,167 at 145,031; *Northwest Piping*, *Inc.*, IBCA No. 2611-A, 89-2 ¶ 21,794 at 109,657-58.

RBC presented direct testimony from Mr. Balcazar, regarding his experience, both before and after the project, in obtaining IVU tax exemptions for materials purchased by a contractor for incorporation into a federal project (tr. 1/56-57). Mr. Balcazar additionally testified that the tax exemption form executed by Mr. Castillo for the project, form AS 2916.1, is the same form that he used to obtain exemptions from IVU taxes on other federal projects (tr. 1/57; R4, tab 142 at GR4_4160). RBC additionally cites to the minutes of the preconstruction meeting where Ms. Rivera told Mr. Balcazar that it would not be a problem for the government to provide the tax exemption form (app. supp. R4, tab 84 at 6). Against this testimony, the government relies upon the testimony of Ms. Rivera that "contractors had been experiencing difficulty getting the Puerto Rico Treasury to accept tax exemption form[s] from the federal Government's contractors" (gov't resp. br. at 45 (citing tr. 5/79)). We find that Mr. Balcazar's direct testimony of his personal experience, both before and after the

22

Caguas project, combined with the meeting minutes, outweighs Ms. Rivera's testimony regarding the "difficulty" experienced by other contractors.

The government additionally cites to *Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002) for the proposition that FAR 52.229-3(h) does not require the government to create documents, but only to provide existing information (gov't resp. br. at 46). In *Hunt Construction* the contractor was building a hospital for the Department of Veterans Affairs, and sought compensation for Arizona state taxes for purchases of permanent materials by "qualifying hospitals" or their agents. *Hunt Construction*, 281 F.3d at 1371. However, to be eligible for the state tax exemption, the government would need to designate Hunt to be a "purchasing agent" of the government. *Id.* The Federal Circuit rejected Hunt's argument that the contract required the government to designate it as a "purchasing agent." *Id.* at 1372-73. Thus, we find that *Hunt Construction* does not excuse the government from filling out the Puerto Rico tax exemption form AS 2916.1, because the record does not demonstrate that the government would need to designate RBC as a purchasing agent to obtain the tax refund.

For the reasons stated above, we sustain the appeal in ASBCA No. 60050. However, this opinion addresses only entitlement and not quantum. The contracting officer's final decision on this claim states that the tax exemption is only available to agents or instrumentalities of the government (R4, tab 128 at GR4_3936). In addition, the appeal file contains an amendment to the Puerto Rico Treasury Regulations appearing to indicate that the tax exemption is only available to "entities that operate or act in the name of or on behalf of the Government" and is "not applicable to entities merely for having contracts with the Government and that, as part of those contracts, they need to acquire taxable items subject to the [sales and use tax]" (R4, tab 132 at GR4_4065). These documents were not discussed at the hearing or in the post-hearing briefing. We make no findings of fact regarding whether RBC was legally entitled to recover the IVU tax, or whether RBC will be able to establish any quantum.

V. Roofing Claims and Delay (ASBCA No. 60277)

A. Built-up Roofing at Puerto Nuevo

Another issue in dispute in this appeal is the government's ability to review submissions approved by RBC's designer of record. The contract contains FAR 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997). This FAR section defines "Shop drawings" as "drawings, submitted to the Government by the Contractor . . . showing in detail (1) the proposed fabrication and assembly of structural elements, and (2) the installation (i.e., [form,][5] fit, and attachment details) of materials or equipment" and provides that "[t]he Contracting

---

[5] The contract omits the word "form" that is contained in the FAR clause.

Officer will indicate an approval or disapproval of the shop drawings and if not approved as submitted shall indicate the Government's reasons therefor" (R4, tab 4 at GR4_209; FAR 52-236-21(d), (e)). Section 01 33 00 of the contract details the submittal procedures (R4, tab 4 at GR4_1195). Subsection 1.2 "Submittals" provides that "Government approval is required for submittals with a 'G' designation; submittals not having a 'G' designation are for information only" (*id.* at GR4_1197). The following subsection, 1.3 "Submittal Classification" provides in relevant part:

> 1.3.1  Designer of Record Approved (DA)
>
> Designer of Record (DOR) approval is required for extensions of design, critical materials, any deviations from the solicitation, the accepted proposal, or the completed design, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer.  Within the terms of the Contract Clause entitled, "Specifications and Drawings for Construction," they are considered to be "shop drawings."  *The Government may review any or all Designer of Record approved submittals for conformance to the Solicitation*, *Accepted Proposal and the completed design. . . .*
>
> 1.3.2  Government Approved –G
>
> Government approval is required for extensions of design, critical materials, deviations, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer.  Government approval is required for any deviations from the Solicitation or Accepted Proposal and other items as designated by the Contracting Officer.  Within the terms of the Contract Clause entitled, "Specifications and Drawings for Construction," they are considered to be "shop drawings."
>
> 1.3.6  Information Only
>
> Submittals not requiring Government approval will be for information only.  *For Design-build construction all submittals not requiring Designer of Record or Government approval will be for information only.*  They

are not considered to be "shop drawings" within the terms
of the Contract Clause referred to above.

(*Id.* at GR4_1197-99) (emphasis added)

Contract § 07 52 00.00 48 "Modified Bituminous Sheet Roofing" (R4, tab 4 at GR4_1532-37) provides that UL 790 and UL 1256 "establish minimum requirements for materials, systems and execution that may be specified in this Section" (R4, tab 4 at GR4_1532). The contract section for the built-up roofing requires submittals including "1. Product Data: Provide product data for the following: . . . e. Modified bitumen sheet" (R4, tab 4 at GR4_1532). The contract section further provides that the modified bitumen sheet "shall meet the following requirements: . . . d. Impact Resistance. ASTM D 3746, No Damage" (*id.* at GR4_1534). The contract section lists the required submittals of product data, certificates, and records, but not testing data (*id.* at GR4_1532-33).

The contract section for the built-up roof states under the heading "Warranty" that:

> Manufacturer's No Dollar Limit warranty for the roofing
> system shall be provided for not less than 20 year [sic] from
> acceptance of the work. Warranty shall state that
> manufacturer shall repair or replace defective materials if the
> roofing system leaks or allows the insulation beneath the
> membrane to become wet during the period of the warranty.

(R4, tab 4 at GR4_1533-34) Additionally, contract § 01 02 00.00 48 "Part 6 Architectural and Interior Design" subsection 6.4.3.1 provides that "All roof systems shall have 20-year material, finish, and weathertightness warranties. See Outline Technical Specifications for required warranty language" (R4, tab 4 at GR4_370). The contract required RBC to design for a minimum wind speed of 145 miles per hour (R4, tab 4 at GR4_382 ¶ 7.3.2). Contract § 01 02 00.00 48 "Part 6 Architectural and Interior Design" subsection 6.4.3 "Roofs" provides that the:

> [r]oofing system shall have a minimum of Underwriters
> Laboratory (UL) Class A rating for fire resistance, UL 120
> wind resistance rating, and Factory Mutual (FM) I-120 fire
> and wind resistance rating. Roof system assembly for this
> project shall be a complete system, tested and approved in
> accordance with FM I-120, UL 580, and local building
> code requirements.

(R4, tab 4 at GR4_369)

On May 20, 2013, RBC submitted its built-up roofing submittal, 07 52 00-1, to the government (ASBCA No. 60277 (60277) answer at 4 ¶ 17; R4, tab 152 at GR4_4359). By the end of May 2013, RBC had all of the required materials on-site and was ready to begin installing the built-up roofing system (tr. 4/94). RBC flew-in its roofing observer from the United States to begin the installation of the roofing system (tr. 4/105-06; app. supp. R4, tab 43 at 2, tab 138 at 1). On June 12, 2013, the government informed RBC that the built-up "roofing submittal doesn't meet the RFP requirements and has to be resubmitted and approved before the start of work" (app. supp. R4, tab 43 at 4). On June 17, 2013, the government gave RBC's 07 52 00-1 built-up roof submittal an E code, rejecting the submittal and requiring resubmission (tr. 1/100; R4, tab 152 at GR4_4416-17). Ms. Kathy Sweeton, the USACE Louisville District roofing expert, drafted the government comments on RBC's built-up roofing submittal, 07 52 00-1 (tr. 6/182). In comment 1(c) on built-up roofing submittal 07 52 00-1, the government requested information regarding test reports (R4, tab 152 at GR4_4417). In comment (1)(g) the government requested that RBC provide warranty information. The government additionally requested test results demonstrating compliance with ASTM D 3746 (*id.* at ¶ 1h). In comment (2) the government requested wind uplift calculations. Additionally, comment (2) stated the design must meet a wind speed of 150+ mph. The government subsequently withdrew the comment regarding wind speed (tr. 6/109). The government's rejection of RBC's submittal was provided 15 days outside of the contractual 14-day government review period (tr. 6/10; 60277 answer at 4 ¶ 17; R4, tab 152 at GR4_4416). The government's rejection of 07 52 00-1 caused the construction on the built-up roof to stop (tr. 1/100; 60277 answer at 5-6 ¶ 19; app. supp. R4, tab 20 at 27).

On June 14, 2013, resident engineer Maricarmen Crespo wrote to ACO Thomas McQuary regarding built-up roofing submittal 07 52 00-1 and "issues on this contract due to the interpretation of the Contractor in terms of who is the approving authority for submittals." Ms. Crespo stated that "[s]ince the Contract is not very clear" she needed Mr. McQuary's guidance. (App. supp. R4, tab 43 at 1-2) Mr. McQuary responded to Ms. Crespo and stated that her email "warrants re-reading the contract – esp specs all related to design responsibilities. The submittal register defines some as govt approved, some as DOR approved…" (*id.* at 1).

On June 28, 2013, RBC submitted built-up roofing submittal 07 52-00-1.1 to the government (R4, tab 162 at GR4_4564). On July 11, 2013, the government gave RBC's 07 52 00-1.1 submittal an E code, rejecting the submittal and requiring resubmission (*id.*) Ms. Sweeton again drafted the government's comments on the built-up roofing submittal 07 52 00-1.1 (tr. 6/199). Ms. Sweeton commented on issues raised in rejecting the first submission, and also new issues not previously raised in her comments on the prior submittal, 07 52 00-1 (tr. 6/199-200). Ms. Sweeton commented again regarding the impact resistance for bitumen sheet (R4, tab 166 at GR4_4580 ¶ 4, "Please provide supporting evidence that the material submitted meet [sic] the specification"). Additionally, in comment (6), Ms. Sweeton continued to request warranty information

26

(*id.*).  On July 10, 2013, RBC submitted built-up roofing submittal 07 52 00-1.2 to the government (tr. 1/104-05; R4, tab 167 at GR4_4581).  It appears that only the transmittal for RBC's second revised submittal is contained in the Rule 4 file (R4, tab 167 at GR4_4581).  On July 19, 2013, the Government gave RBC's 07 52 00-1.2 submittal a "C" code, conditionally approving the submittal except as noted and requiring resubmission (tr. 1/106; R4, tab 168 at GR4_4582).

In comment (1) on built-up roofing submittal 07 52 00-1.2, Ms. Sweeton requested a test report (tr. 6/200; R4, tab 168 at GR4_4582).  The government required resubmission, providing that "[a] confirmation letter on the Roof Manufacturer's letter head is not acceptable documentation that the roof product complies with ASTM 3746 Impact Resistant Testing.  A test report from an independent laboratory demonstrating compliance with ASTM 3746 is needed" (R4, tab 168 at GR4_4582).  Mr. Balcazar testified for RBC that its submission included a letter stating that the product met the impact resistance for ASTM 3746, but that the government would not accept the letter and required an independent lab report (tr. 1/106-07).  Additionally, in comment (3), the government continued to request warranty information (tr. 1/104, 107-08).

RBC responded to the government's comments on submittal 07 52 00-1.2 and the government acknowledged the built-up roofing submittal as approved on July 19, 2013 (app. supp. R4, tab 117 at 13).  Subsequently, RBC re-coordinated and commenced work on August 5, 2013 (app. supp. R4, tab 117 at 13-14).  The built-up roofing system originally proposed by RBC in its first submittal, 07 52 00-1, is the same system that was eventually installed at the Training Center and Assembly Hall building by RBC (tr. 1/108).  In response to Ms. Sweeton's instruction, RBC changed the designation of the built-up roofing submittal in its November 12, 2013 submittal register from for information only (FIO) to government approval required (tr. 3/104; app. supp. R4, tab 120 at 81).  Ms. Sweeton did not testify at the hearing.  Instead, the government presented the testimony of Ms. Colin Mulhall.  She testified that she was not a roofing specialist and relied upon the work of Ms. Sweeton, in reviewing RBC's submittals (tr. 6/157).  After Ms. Mulhall's deposition, she prepared analyses of RBC's roofing submittals at the request of counsel (tr. 6/118-19, 127; R4, tabs 264, 282-284).

B.  Standing Seam Roofing System

Also relevant to this appeal is the specification for the standing seam roof on the OMS building contained at contract § 07 61 14.00 48 – Hydrostatic (Water-tight) Standing Seam Metal Roofing System.  Section 07 61 14 identifies the contractually-required submittals for the standing seam roof (tr. 6/211; R4, tab 4 at GR4_1559-65).  RBC's standing seam roofing submittal required designer of record approval (tr. 6/104, 107-08, 162-63, 217-18, 220).  Prior to November 12, 2013, the submittal register for the

project designated the submittal for the standing seam roof at the OMS building, 07 4113.16, as FIO (app. supp. R4, tab 120 at 30, 81).

The standing seam roof requirements specify the required submittals and provides "5. Closeout Submittals: Warranties and Information Card" (R4, tab 4 at GR4_1565). The statement of work, § 01 02 00.00 48 of the contract, ¶ 1.6.1, provides that the "RFP Outline Technical Specifications are provided primarily in outline format. They shall be utilized as design and submittal criteria, and minimum standards for the corresponding construction work, and shall be met or exceeded unless Contractor obtains specific Government approval for proposed reductions." (R4, tab 4 at GR4_322) The section further provides ¶ 1.6.3 that "[m]ost of the outline specification sections are adapted from typical Government Unified Facility Guides Specifications (UFGS) and reflect Army Reserve-approved approaches and products" and that the "[c]ontractor's final specifications may be developed from UFGS, one of the industry prototype specifications (such as MasterSpec), or Contractor's designers' company specification system. Use of UFGS is not required" (R4, tab 4 at GR4_322-33).

On March 4, 2013, RBC submitted a steel structure standing seam roofing material and steel structure joists submittal, 05 21 00-2, to the government (R4, tab 171 at GR4_4629). On March 19, 2013, the government gave the 05 21 00-2 submittal an F code, which means receipt acknowledged (tr. 6/133-34). However, RBC's March 4, 2013 submittal, had a transmittal code (No. 05 21 00-2) indicating that it was for the structural steel joists and the support system below the roof (tr. 6/133; R4, tab 171 at GR4_4629). The submittal also contained documents relating to a standing seam system, but the government never considered the submittal to be for the OMS roofing system (tr. 6/134-35). On August 6, 2013, DOR Harvard Jolly approved RBC's standing seam roofing submittal as in "general conformance with design concept and general compliance with contract documents" (tr. 4/48-50; R4, tab 172 at GR4_4725).

RBC submitted its standing seam roofing submittal, 07 41 13.16-1, dated August 8, 2013, to the government (R4, tab 172 at GR4_4723). On August 19, 2013, Ms. Sweeton reviewed RBC's standing-seam roof submittal, 07 41 13.16-1, and "found many deficiencies" based on a "cursory review" and without having "seen the specification for this job" (app. supp. R4, tab 44 at 3). On August 22, 2013, the government gave RBC's submittal, 07 41 13.16-1, an E code, disapproving the submittal (R4, tab 264 at GR4_6995). Ms. Sweeton drafted the Government's comments on RBC's submittal, 07 41 13.16.1 (tr. 6/201-02; R4, tab 264 at GR4_6996). In comment (2) on submittal 07 14 13.16-1, Ms. Sweeton stated that the "proper specification" was not used by RBC in its final design and that the "proper specification is in the RFP…07 61 14.00 48" (R4, tab 264 at GR4_6996). However, the specification for the standing seam roof was not required to be in the final design package. Instead, the specification for the standing seam roof was required to be in the building envelope package. (Tr. 6/202-03) Specifications for the roofing sections

were part of the building envelope package (tr. 6/105-07). Additionally, in comment (3), Ms. Sweeton stated that she would use the "proper specification" to make her comments (R4, tab 264 at GR4_6996). The specification for the standing seam roof provides that: "[p]ermanent fall arrest systems are required at roof edges whenever roof heights exceed 16 feet and building size exceeds 10,000 square feet" (R4, tab 4 at GR4_1561 ¶ g). The design specifications required that the OMS building be between 3,050 and 3,083 square feet (R4, tab 4 at GR4_326 § 1.8.1.2).

In comment (8) on standing seam roofing submittal 07 41 13. 16-1, Ms. Sweeton requested RBC provide fall arrest system information (R4, tab 264 at GR4 6996). In comment (14), Ms. Sweeton requested warranty information (*id.*). The RFP standing seam specification § 07 61 14 identified warranties as required "Closeout Submittals" and the project was not in close-out (tr. 6/212-13; R4, tab 4 at GR4_1565). Closeout submittals are provided at the end of the project (tr. 6/171-72; R4, tab 4 at GR4_1197).

RBC submitted its standing seam roofing submittal, 07 41 13.16-1.1, dated September 6, 2013 (but stamped received by the government on September 10, 2013), to the government (R4, tab 176 at GR4_4845). On September 25, 2013, the government gave an E code to RBC's standing seam submittal, 07 41 13.16-1.1, disapproving the submittal. Ms. Sweeton again drafted the government's comments on the submittal (tr. 6/12, 215-16; R4, tab 176 at GR4_4846). The government did not timely provide comments to RBC regarding standing seam submittal 07 41 13.16-1.1 because it "thought that this was going to be discuss[ed] internally on [Louisville District] before send [sic] anything to the KTR" (app. supp. R4, tab 45 at 2). The parties dispute the date that RBC provided the submittal to the government, with RBC asserting that it was submitted on September 6, 2013. We find that the government's rejection of RBC's standing seam submittal, 07 41 13.16-1.1, occurred one day outside of the 14-day contractual government review period, based on a September 10, 2013, submission (60277 answer at 8 ¶ 25 (compl. ASBCA No. 60277 asserting that the document was submitted to the government on September 10, 2013)). In comment (1) on submittal 07 41 13.16-1.1, Ms. Sweeton stated that "MasterSpec is not equivalent to the Army Reserve Guide Specs" (R4, tab 176 at GR4_4846). In comment (2) on submittal 07 41 13.16-1.1, Ms. Sweeton stated that the Army Reserve guide specifications required that the standing seam roof be approved by the government (*id.*).

On November 1, 2013, RBC submitted its standing seam roofing submittal, 07 41 13.16-1.2 (R4, tab 179 at GR4_4894). On November 12, 2013, the government gave RBC's submittal, 07 41 13.16-1.2, an E code, disapproving the submittal (R4, tab 179 at GR4_4895). Ms. Sweeton drafted the government's comments on the submittal (tr. 6/220-21). In comments 3(a) through (j), Ms. Sweeton continued to request warranty information (R4, tab 179 at GR4_4895). In response to Ms. Sweeton's instruction, RBC changed the designation of the standing seam roofing submittal in its

November 12, 2013 submittal register from FIO to government approval required (tr. 3/104; app. supp. R4, tab 120 at 81).

On December 16, 2013, RBC submitted standing seam roofing submittal 07 41 13.16-1.3 (R4, tab 184 at GR4_5088). On January 8, 2014, the government gave RBC's 07 41 13.16-1.3 submittal a "C" code, meaning conditional approval, and stated that the "contractor's responses to the Government shall be submitted NLT the preparatory meeting, otherwise work will not be allowed to start" (R4, tab 184 at GR4_5089-90). The government's response to RBC's 07 41 13.16-1.3 submittal occurred 9 days outside of the 14-day contractual government review period (tr. 6/25-26; R4, tab 184 at GR4_5088). Additionally, Ms. Sweeton continued to request warranty information (tr. 6/221; R4, tab 184 at GR4_5089).

On January 14, 2014, RBC submitted standing seam roofing submittal 07 41 13.16-1.4 (R4, tab 187 at GR4_5119). From January 27, 2014, to February 24, 2014, the government internally discussed that Ms. Sweeton's comments on standing seam roofing submittal 07 41 13.16-1.4 were overdue (app. supp. R4, tab 48). On February 26, 2014, the government gave RBC's 07 41 13 16-1.4 submittal a "C" code and provided comments (R4, tab 187 at GR4_5120). The government response to RBC's 07 41 13.16-1.4 submittal was provided 29 days outside of the 14-day contractual government review period (tr. 6/28-29; R4, tab 187 at GR4_5119-20). The OMS standing seam roofing system was at a stop, due to the government's comments on RBC's submittals (app. supp. R4, tab 20 at 29, 31, 33, 35, 37, 40). On February 28, 2014, RBC began working on the underlayment of the standing seam roofing system (tr. 8/140; app. supp. R4, tab 137 at 4).

C. Other Claims and Delay

RBC's claim that was appealed in ASBCA No. 60277, revised its claims regarding the design review process with regard to the cistern, building facade, and discovery of asbestos previously discussed in its claim appealed in ASBCA No. 59404 and the kitchen equipment claim previously included in its claim appealed in ASBCA No. 59962. The claim asserted entitlement to 566 calendar days of delay and $3,418,521.95 in delay costs (R4, tab 147 at GR4_4242, 4253). The facts relevant to these issues were addressed above. RBC's allegations pertaining to the calculation of the number of days of delay are addressed at the end of this opinion.

DECISION ASBCA No. 60277

RBC's claim included updates to its previously filed claims regarding the design review delays, training building facade, asbestos fuel line, and OMS building change asserted in ASBCA No. 59404; and updates to its kitchen equipment claim asserted in ASBCA No. 59962. These updates were considered above, and are not further addressed in this section. RBC additionally raised new claims regarding the built-up roofing on the

Puerto Nuevo site and the standing seam roofing system for the OMS building. (R4, tab 147)

### A. Built-up Roofing, Puerto Nuevo

Both of the roofing claims depend on contractual provisions regarding government approval of the roofing designs. RBC asserts that the roofing submittals only required approval by its designer of record and that the government's comments, in addition to being untimely, were beyond the scope of the contract (app. br. at 22-23). The government contends that it has the right to "review, approve or reject non-compliant submittals" and that "delays incident to the submission of non-complaint submittals, whether previously approved by its DOR or not, are attributable to RBC" (gov't resp. br. at 21).

As always, we start our analysis with the terms of the contract. *TEG-Paradigm Envtl.*, 465 F.3d at 1338. As set forth in more detail above, the contract contains FAR 52.236-21, "SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997), that contains a definition of the term "Shop drawings" (R4, tab 4 at GR4_209; FAR 52-236-21(d), (e)). The contract provides that "Government approval is required for submittals with a 'G' designation; submittals not having a 'G' designation are for information only" (*id.* at GR4_1197). However, the contract also provides that "[t]he Government may review all Designer of Record approved submittals for conformance to the Solicitation, Accepted Proposal and the completed design" and that "[f]or Design-build construction all submittals not requiring Designer of Record or Government approval will be for information only. They are not considered to be 'shop drawings' within the terms of the Contract Clause referred to above" (*id.* at GR4_1197-99) (emphasis added).

Read as a whole, we find that the contract clearly provided the government with the right to review designer of record approved submittals for conformance to the solicitation, RBC's proposal, and the completed design (*id.* at GR4_1198). Section 1.3.1, Designer of Record Approved, providing that, "The Government may review any or all Designer of Record approved submittals for conformance to the Solicitation, Accepted Proposal and the completed design.").

RBC contends that the contract is ambiguous regarding the approving authority because the technical sections regarding roofing provide for designer of record approval, and not government approval, and the inclusion of FAR 52.236-21 providing that the contracting officer can approve shop drawings, creates a latent ambiguity (app. br. at 18). RBC then contends that its interpretation should prevail based upon the rule of *contra proferentem* (*id.*). RBC cites to conduct of the parties including the fact that the government did not tell RBC that it would review the roofing submittals and a statement by resident engineer Ms. Crespo that the "contract is not very clear"

31

regarding review of the submittals as proof of ambiguity (app. br. at 19-20). We disagree.

As noted above, the contract specifically provides that the government may review designer of record approved submittals, and RBC has given us no good reason to ignore this clear contractual text. Moreover, even if RBC were to rely on section 1.2 providing that "submittals not having a 'G' designation are for information only," the subsection regarding for information-only submittals provides that, for design-build contracts, such as the contract here, "all submittals not requiring Designer of Record or Government approval will be for information only" (R4, tab 4 at GR4_1197-99). As the submittals in dispute required designer of record approval they do not qualify as "for information only" submittals pursuant to the contract. Having determined that the government was permitted to review the designer of record submissions, we next review the government's comments to determine if they were within the scope of the contract, RBC's proposal and the design.

As noted above with regard to RBC's design review claim, we hold that the government was required to provide its comments within 14 days. *ADT Constr. Grp.* 09-2 BCA ¶ 34,200 at 169,085. RBC established that the government provided its comments on the initial built-up roofing submittal 29 days after submission (60277 answer at 4 ¶ 17; R4, tab 152 at GR4_4417, submitted May 20, 2013, disapproved June 18, 2013). Thus, the government responded 15 days beyond the time permitted by the contract.

RBC additionally alleges that the government's review of the submission went beyond the terms of the contract and required test reports and design calculations that were not required by the contract (app. br. at 24-25). In response, the government relies upon the testimony of Mr. Steve Heiser, the architect of record for RBC's Designer of Record, Harvard Jolly, Contracting Officer's Representative Ms. Colin Mulhall and documents prepared by Ms. Mulhall evaluating RBC's claim (gov't resp. br. at 22-25). However, the government's opposition suffers from serious weaknesses. First, regarding Mr. Heiser, he admitted during cross-examination at the hearing that he did not have personal knowledge of the contractual requirements of the government's review and was basing his testimony on documents provided to him by the government after his deposition (tr. 4/42-44). Mr. Heiser did not have a copy of the contract at issue in this appeal and based his testimony regarding the timeliness of government comments on his experience with Florida state construction contracts (tr. 4/50-53).

Regarding Ms. Mulhall's testimony, she testified that she was not a roofing specialist and relied upon the work of another government employee, Ms. Kathy Sweeton, in reviewing RBC's submittals (tr. 6/157). After Ms. Mulhall's deposition in these appeals, she prepared analyses of RBC's submittals at the request of counsel (tr. 6/118-19, 127; R4, tabs 264, 282-284). We find that Ms. Mulhall's documents have no evidentiary value as she lacks personal knowledge of Ms. Sweeton's review of the submittals and

because the documents were not prepared in the ordinary course of business, but were prepared for purposes of litigation by a fact witness. *See*, *e.g.* FED. R. EVID. 803.[6]

RBC contends that the government went beyond the terms of the contract in rejecting its first built-up roofing submission by requiring that RBC provide test reports, warranty information, and design calculations not required by the contract, and also by requiring RBC to design to a higher wind speed calculation than specified in the contract (app. br. at 23). RBC also alleges that the government went beyond the terms of the contract in reviewing the second built-up roofing submission by requiring warranty information not required by the contract and by raising new concerns not raised in the review of the first submission (app. br. at 23). Additionally, RBC contends that the government's conditional approval of RBC's third built-up roofing submission required RBC to resubmit the submission, again requesting test reports and warranty information not required by the contract (app. br. at 23-24).

We start with contract § 07 52 00.00 48 "Modified Bituminous Sheet Roofing" (R4, tab 4 at GR4_1532-37). In rejecting RBC's first built-up roofing submission, the government stated that the RFP required "c) A system which has been tested by UL 790 and UL 1256" (R4, tab 152 at GR4_4417). In fact, the built-up roofing section provides that UL 790 and UL 1256 "establish minimum requirements for materials, systems and execution that may be specified in this Section" (R4, tab 4 at GR4_1532). The contract section lists the required submittals of product data, certificates, and records, but not testing data (*id.* at GR4_1532-33). The government cites to the submittals section of the contract, § 01 33 00, and cites the definition of a test report as support for the requirement of a test report (R4, tab 263 at GR4_6986). However, the government does not cite any language in § 07 52 00.00 48 requesting a test report as a deliverable. We find that the contract did not require RBC to provide test reports for the built-up roofing.

RBC next cites to the government's rejection of RBC's first built-up roofing submission stating that RBC was required to provide "a 20 year No Dollar Limit Watertightness warranty which begins at the acceptance of work" (R4, tab 152 at GR4_4417, comment 1g). The contract section for the built-up roof states under the heading "Warranty" that "Manufacturer's No Dollar Limit warranty for the roofing system shall be provided for not less than 20 year [sic] from acceptance of the work. Warranty shall state that manufacturer shall repair or replace defective materials if the roofing system leaks or allows the insulation beneath the membrane to become wet during the period of the warranty" (R4, tab 4 at GR4_1533-34). Additionally, contract § 01 02 00.00 48 "Part 6 Architectural and Interior Design" subsection 6.4.3.1 provides that "[a]ll roof systems shall have 20-year material, finish, and

---

[6] Though the Board's rules do not strictly require us to follow the Federal Rules of Evidence, they provide guidance, *see* Board Rule 10(c), which we decline to depart from here.

weathertightness warranties. See Outline Technical Specifications for required warranty language" (R4, tab 4 at GR4_370). Although not listed as a submittal in the built-up roof section, the warranty provision of the built-up roofing section clearly contemplates that the contractor will provide evidence of the existence of the warranty, and requires specific language (*id*. at GR4_370, 1533-34). We find that the government acted within the scope of the contract in requesting a copy of the warranty.

RBC additionally, argues that the government improperly required RBC to design the roof for 150 miles per hour winds and further submit wind uplift calculations (app. br. at 23). The government concedes that the contract required the design for 145 miles per hour, rather than 150 miles per hour wind, but contends that this error was quickly corrected and did not result in any delay (gov't resp. br. at 23, n.7). We find that the government comment went beyond the contract, but find that RBC has not identified any delay attributable to the comment. With regard to the wind uplift calculations, the government cites to contract § 01 02 00.00 48 "Part 6 Architectural and Interior Design" subsection 6.4.3 "Roofs" which requires the roofing system to comply with the Underwriters Laboratory and Factory Mutual wind uplift standards (R4, tab 4 at GR4_369). We find that the uplift calculations were required by the contract.

On June 28, 2013, 10 days after the government rejected RBC's first built-up roofing submittal, RBC submitted its revised built-up roofing submittal 07 52 00-1.1 (R4, tab 162 at GR4_4564). On July 11, 2013, the government again rejected RBC's submittal (*id.* at GR4_4565). The government's comments repeated issues that had not been corrected from the first rejection of the submittal, including the request for warranty information, and raised new concerns (*id.*). As discussed above, we find that RBC was required to provide warranty information, and further find that the government did not request information beyond the scope of the project in the second rejection of RBC's built-up roofing submittal. Although there was some discussion of the warranty information that was provided, RBC does not contend that this information met the requirements of the contract.

On July 10th (the day before the government's July 11th rejection of the earlier submission) RBC submitted its second revised built-up roofing submittal, 07 52 00-1.2, to the government (R4, tab 167). On July 19, 2013, the government conditionally accepted the submission, with comments and requiring resubmission (*id.*). RBC contends that two of the government's three comments were beyond the scope of the contract (app. br. at 23-24). One of the government's comments again requested a copy of the warranty (R4, tab 168). For the reasons stated above, we find that this request was not beyond the terms of the contract.

The government's other comment challenged by RBC required a "test report from an independent test laboratory demonstrating compliance with ASTM 3746" or a change in the materials to provide more impact resistance (R4, tab 168). The contract section for

the built-up roofing requires submittals including "1. Product Data: Provide product data for the following: . . . e. Modified bitumen sheet" (R4, tab 4 at GR4_1532). The contract section further provides that the modified bitumen sheet "shall meet the following requirements: . . . d. Impact Resistance. ASTM D 3746, No Damage" (*id.* at GR4_1534). The government raised this issue when it rejected RBC's first submittal (R4, tab 152 at GR4_4417 ¶ 1.h) and RBC's first revised submittal (R4, tab 166 at GR4_4580 ¶ 4, "[p]lease provide supporting evidence that the material submitted meet [sic] the specification"). It appears that only the transmittal for RBC's second revised submittal, rather than the entire submittal, is contained in the Rule 4 file (R4, tab 167). The government conditionally accepted the second revised submittal, but required resubmission, providing that "[a] confirmation letter on the Roof Manufacturer's letter head is not acceptable documentation that the roof product complies with ASTM 3746 Impact Resistant Testing. A test report from an independent laboratory demonstrating compliance with ASTM 3746 is needed" (R4, tab 168 at GR4_4582). Mr. Balcazar testified for RBC that its submission included a letter stating that the product met the impact resistance for ASTM 3746, but that the government would not accept the letter and required an independent lab report (tr. 1/106-07).

The contract requires "product data" for the modified bitumen sheet and provides that it should satisfy ASTM D 3746 with no damage (R4, tab 4 at GR4_1532-34). The contract does not require independent laboratory test results. Here, the letter does not appear to be in evidence but based on the testimony in the record, we see no basis for the government rejecting the product data provided by RBC. Ms. Mulhall indicated in her analysis of Ms. Sweeton's comments that RBC relied upon a letter stating that the roofing system showed no damage when tested, but that the letter included no test results or documentation supporting this statement (R4, tab 283 at GR4_7636). As noted above, we give no evidentiary weight to Ms. Mulhall's statements, and, to the extent Ms. Mulhall is providing an interpretation of the contract, we perform a *de novo* analysis. Even assuming the truth of Ms. Mulhall's statements, they would not provide a basis for requiring independent laboratory test results when the contract simply requires "product data."

RBC additionally asserts that it is entitled to recover damages for additional work related to the built-up roof (app. br. at 25). However, RBC did not assert a claim for additional costs of performance for the built-up roof (R4, tab 147). As a claim for additional work related to the built-up roof was not presented to the contracting officer for a decision, we lack jurisdiction to entertain RBC's claim for additional costs of performance. *M. Maropakis Carpentry*, *Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010). Thus, we find that RBC has established 15 days of delay for extended review time, plus 31 days of concurrent delay from June 18, 2013, to July 19, 2013, due to the government's requests for test results not required by the contract in approval of the roofing submissions.

B. Standing Seam Roofing System

RBC alleges that the government delayed installation of the standing seam roof by failing to respond to submissions within 14 days, by requiring a fall-arrest system not required by the contract, by requiring it to use the UFGS software rather than MasterSpec, by changing the approval authority to require government approval, and requiring warranty information (app. br. at 21-25).  In response, the government again relies upon the testimony of Mr. Heiser, and Ms. Mulhall and documents prepared by Ms. Mulhall, on direction of counsel, evaluating RBC's claim (gov't resp. br. at 22-25).  For the reasons stated above, we find that the documents prepared by Ms. Mulhall are not entitled to evidentiary weight.

As discussed above, we find that the contract required that the government review submissions within 14 days.  Here, RBC demonstrated that the government took 15 days to review RBC's first revised standing seam roofing submission, one day longer than permitted by the contract (R4, tab 176 at GR4_4845).  The government took 23 days to provide comments on RBC's third revised standing seam roof submittal, nine days longer than permitted by the contract (R4, tab 184).  The government took 43 days to respond to RBC's fourth revised standing seam roof submittal, 29 days longer than permitted by the contract (R4, tab 187).  Thus, the government was responsible for 39 days of delay by responding late to RBC's submissions.  *ADT Constr. Grp.*, 09-2 BCA ¶ 34,200 at 169,085.

RBC contends that the government improperly compared RBC's submissions against the contract specifications rather than against RBC's specifications.  RBC contends that the government improperly required it to provide a fall arrest system (app. br. at 27).  The specification for the standing seam roof provides that: "[p]ermanent fall arrest systems are required at roof edges whenever roof heights exceed 16 feet and building size exceeds 10,000 square feet" (R4, tab 4 at GR4_1561 ¶ g).  However, the design specifications required that the OMS building be between 3,050 and 3,083 square feet (*id.* at GR4_326 § 1.8.1.2).  Thus, we find that the fall arrest system was not required by the contract.

RBC contends that the government delayed its performance by rejecting its standing seam roof submittal for failure to provide warranty information when the warranty information was not required until close-out (app. br. at 28).  The standing seam roof requirements specify the required submittals and provides, "5. Closeout Submittals:  Warranties and Information Card" (R4, tab 4 at GR4_1565).  Thus, we find that the government improperly requested warranty information before it was due pursuant to the contract.

RBC submitted a revised standing seam roof submittal that the government again rejected.  RBC contends that the government improperly forced RBC to use the UFGS and not MasterSpec, which was permitted by the contract (app. br. at 27-28).  In

36

rejecting the submission, the government stated that: "MasterSpec is not equivalent to the Army Reserve Guide Specs. This product has been rejected before because it did not meet the AR Metal Roof Guide Spec." (R4, tab 284 at GR4_7368, comment 1). The statement of work, § 01 02 00.00 48 of the contract, ¶ 1.6.1, provides that the "RFP Technical Specifications are provided primarily in outline format. They shall be utilized as design and submittal criteria, and minimum standards for the corresponding construction work, and shall be met or exceeded unless Contractor obtains specific Government approval for proposed reductions" (R4, tab 4 at GR4_322). The section further provides ¶ 1.6.3 that "[m]ost of the outline specification sections are adapted from typical Government Unified Facility Guides Specifications (UFGS) and reflect Army Reserve-approved approaches and products" and that the "[c]ontractor's final specifications may be developed from UFGS, one of the industry prototype specifications (such as MasterSpec), or Contractor's designers' company specification system. Use of UFGS is not required" (R4, tab 4 at GR4_322-23). Thus, the contract does not require that a contractor use UFGS, but the contractor must comply with the contract specifications that are mostly derived from the UFGS. Here, RBC does not demonstrate that it was forced to perform additional effort to rework submissions in UFGS or that it was required to do anything not required by the contract. We read the government's statement that "MasterSpec is not equivalent to the Army Reserve Guide Specs" as simply explaining that RBC must comply with the contract even if MasterSpec permits a different design. We see no nexus between the government's statement and any delay or additional cost to RBC.

RBC complains of the fact that the government directed it to change the approval authority on the submittal log for the standing seam roofing submittal from "for information only," to "government approval" (app. br. at 28). Witness testimony indicated that Ms. Sweeton directed the change in the submittal register to require government review, and provided no contractual basis for the change (tr. 3/104). As discussed above, the government had the right to review submittals requiring designer of record approval, but the government was not the approval authority. RBC has established that the government did not comply with the contract, but does not establish a nexus between the government's change of the proper authority on the submittal register and a delay to the project.

RBC submitted an additional standing seam roofing submittal that was conditionally accepted, but requiring corrections that necessitated the fourth submittal. The government again raised the warranty information issue with both submittals. As noted above, we find that the warranty information was required to be a close-out submittal. However, the fact that the warranty information was still being requested following the conditionally accepted submittal demonstrates that the request did not delay RBC's performance of the contact (R4, tab 283 at GR4_7635). Once again, RBC asserts that it is entitled to recover damages for additional work related to the built-up roof (app. br. at 29). However, RBC did not assert a claim for additional costs of performance for the built-up roof (R4, tab 147). As the claim was not presented to

the contracting officer for a decision, we lack jurisdiction to entertain RBC's claim for additional costs of performance. *M. Maropakis Carpentry*, 609 F.3d at 1327.

In summation, we find that RBC has established 39 days of delay.

C.  Other Claims and Delay

As noted above, we find that RBC has established 15 days of delay, and 31 additional days of concurrent delay, related to the late review of the built-up roofing submittals and 39 days of delay in the review of the standing seam roofing submittal. We address whether these delays were on the critical path and whether they were compensable at the end of this decision.  ASBCA No. 60277 is sustained in part.

VI.  Close-Out Claims (ASBCA No. 60851)

RBC's final claim includes a number of contract close-out issues, including what RBC characterizes as additional kitchen features, close-out work, work required after acceptance of the facility, additional turf establishment, improper deductions and refusal to pay, and interest on the improper deductions.

A.  Additional Kitchen Features

A final inspection was conducted on March 9-10, 2015 (app. supp. R4, tab 10 ¶ 14).  The government accepted the project as substantially complete except for the kitchen in the assembly hall building, as of March 10, 2015 (59494 *et al.* answer at 4 ¶ 14; R4, tab 234).  The government did not accept the kitchen in the assembly building as complete due to non-compliant and/or missing equipment; specifically, a ventilation hood, hot water sanitation equipment, and anchoring of stainless steel tables (59404 *et al*. answer at 5 ¶ 18).  The government conducted a pre-final inspection of the project from July 9, 2014, to July 11, 2014 (R4, tab 113 at GR4_3675).  The RFP at Appendix E-l.l contained a standard kitchen equipment plan and UFC equipment list of kitchen equipment for "inclusion in all Army Reserve training center projects with kitchens" (R4, tab 99 at GR4_3105-06).  RBC asserts that the government required additional changes from its approved design (app. reply br. at 53-54).  The standard kitchen equipment list specifically includes a ventilation hood and a sanitizing booster heater (R4, tab 99 at GR4_3106, items 15-16).  Moreover, the RJS Barber food service specifications note that the contractor was to "set in place per manufacturer's standard specifications" the stainless steel tables (R4, tab 101 at GR4_3157; tr. 5/49-50).  Any changes to the standard kitchen equipment were required to be approved by the ACSIM-ODR project officer (R4, tab 99 at GR4_3101 § 4-2.11.1).  No Kitchen Equipment changes were ever requested by RBC or permitted (tr. 3/195, 5/35-36).  In RBC's opinion, the kitchen equipment that was specified was a "Ford and we gave you a Cadillac" (tr. 1/138).  After a final inspection of the kitchen

in the assembly building on July 14, 2015, the government accepted the kitchen as of that date (R4, tab 234).

B. Additional Work Imposed for Final Acceptance Inspection (Close-out Work)

RBC contends that the government forced it to perform additional work that was not part of RBC's contractual requirements, but which the government characterized as "punch list" work. RBC contends that it performed the additional work under protest in order to get the government to proceed with the final inspection. RBC contends that the additional work increased the direct costs incurred by RBC and its subcontractors by $47,864.39 (tr. 3/156-57, 159-60; R4, tab 196 at GR4_5332-33; app. br. at 39). The Unified Facilities Criteria, at specification 4-3.9.12, requires the contractor to furnish and install an air compressor (app. supp. R4, tab 38 at 160). The Unified Facilities Criteria section 4-2.35.4 provides that the physical readiness training room should have a "classroom lockset" (app. supp. R4, tab 38 at 137-38; tr. 4/147).

RBC installed additional screening shrubs for water heaters and condensing units, which RBC contends were not required by the contract (tr. 3/159-60, 4/143-45; app. br. at 38). Section 5.7.7 of the contract, "Screening" required the contractor to:

> Screen undesirable views such as, but not limited to service areas, mechanical equipment, trash enclosures, etc. from within and outside of project site by the use or combination of mass plantings, earthen berms and architecturally compatible fencing and walls matching facility architecture and materials.

(R4, tab 4 at GR4_362; tr. 5/83)

The government additionally required the installation of an edge strip at the PV array, solar water heaters, and the OMS perimeter fence, which RBC contends was not required by the contract (tr. 3/157-58, 4/142-43). Section 5.9 of the contract "Miscellaneous" subsection "5.9.1 Edger" required that, "[s]hrub & perennial beds adjacent to turf areas and landscape maintenance strips shall include a metal edging system" (R4, tab 4 at GR4_364; tr. 5/83).

The government required that RBC install steel corner guards at the OMS building, which RBC contends was unnecessary additional work and expense because the precast concrete walls exceeded the minimal lateral load and would resist impact and because RBC's design included bollards that RBC contends would adequately protect the corners at issue (tr. 4/145-47). Section 7.3.7 of the contract "Impact Loads" required:

39

In addition to protecting exterior maintenance bay door jambs with bollards, the wall construction of the door jambs shall be designed for a minimum lateral load of 8,000 lb. (factored level) applied at a distance of 4'-0" above the finished floor, to account for unintended vehicle impact. Corners of such jamb walls shall be protected with steel angles or built-up plates with headed studs embedded into the concrete or masonry. Wall construction of such jambs shall be designed to span from floor to anchorage into roof or floor diaphragm.

(R4, tab 4 at GR4_382; tr. 5/84)

RBC contends that the government required the installation of motion sensors at entrance doors in the assembly hall and training center, which were not required by the contract (tr. 4/148). RBC additionally contends that the government required a door hardware modification at the physical readiness room that was not required by the contract (app. proposed findings of fact ¶ 204). Section 6.4.7.1.1 of the contract, "Hardware" required that the contractor:

Provide two electrified entrance doors at each building consisting of the following minimum hardware: Double doors shall have a removable mullion, each leaf shall have a closer, hinges (1/2 pair electric), overhead stops, offset pulls and full weather strip. Locking devices shall consist of one leaf with Electric Latch Retraction Rim Exit Device and one leaf with Night Latch Function. Single doors shall consist of a closer, hinges, overhead stops, offset pulls and full weather strip. Locking devices shall consist of Night Latch Function Rim Exit Device and electric strike.

(R4, tab 4 at 372; tr. 5/84)

C. Additional Work Imposed After Acceptance Inspection

RBC's claim asserts entitlement to $279.62 for purportedly additional work required after final inspection. Specifically, the claim asserts that it was required to provide a card reader programmer at a cost of $189 and an additional mirror over the sink in the training center male bathroom at a cost of $90.62. (R4, tab 196 at GR4_5334)

D. Additional Turf Establishment

RBC was required to install turf and native grasses and maintain the turf and grasses by watering and other measures during the establishment period of 12 months

40

(R4, tab 4 at GR4_361).  On September 30, 2014, RBC notified the government that it had seeded the site and would begin the turf establishment period (app. supp. R4, tab 67 at 2).  On May 12, 2015, the local authority issued a press release regarding a drought in Puerto Rico and instructed citizens not to use water improperly and to avoid watering plants (*id.* at 2, 5-9).  RBC contends that it performed the required maintenance of the turf, such as weeding, mowing, and trimming (*id.* at 2), but was unable to water the grass properly during the drought which prevented the turf from being properly established (tr. 4/150, 154-55; app. supp. R4, tab 67 at 2).  The government presented witness testimony that RBC had stopped watering the grass before the alleged restrictions started (tr. 5/89-90).

RBC cites to a May 12, 2015, Spanish language press release from the Puerto Rican government with a translated title of "What you shouldn't do prior to rationing" and providing that residents should "avoid unnecessary activities like daily watering of plants or car wash" and "avoid excessive mowing of grass.  A taller grass protects the roots and preserves soil humidity" (app. supp. R4, tab 67 at 5-6).  The Puerto Rican government requested that its residents be conscientious with their water use and recommended watering their grass every other day (tr. 5/89, 6/64).  The restrictions started in May-June-July 2015 (tr. 5/89).  There was never a direction not to water, (tr. 5/89) and the facility always had a water supply (tr. 5/89).

The contract includes FAR 52.249-10 providing that "[t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages . . . if (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.  Examples of such causes include (i) acts of God. . . ."  The FAR provision additionally requires that the contractor "within 10 days from the beginning of any delay . . . notif[y] the Contracting Officer in writing of the causes of delay."  (R4, tab 4 at GR4_218)

E. Interests Accrued for Improper Deductions on Applications for Payment

RBC'S claim asserts entitlement to prompt payment interest based upon the purportedly improper deductions from payments identified below.

F. Improper Deductions from Applications for Payments

The government took partial occupancy of the Training Center and assessed pro-rata liquidated damages based on its partial occupancy.  The contract contains FAR 52.236-11, "USE AND POSSESSION PRIOR TO COMPLETION (APR 1984)" which, provides that the government may take possession of any completed or partially completed portion of the work (R4, tab 4 at GR4_206-07).  The clause additionally provides that if the government's possession causes delay or additional costs to the contractor, the contractor is entitled to an equitable adjustment.  FAR 52.236-11(b).  However, the contract does not explicitly provide for the reduction, or pro rata

assessment, of liquidated damages (tr. 6/73).  The contract provides for liquidated damages in the amount of $1,330 per day for each calendar day of delay "until the work is completed or accepted" (R4, tab 4 at GR4_250 § 1.5).  From November 17, 2013, to March 10, 2015 (479 days), the government assessed liquidated damages in the amount of $1,330 per day for a total of $637,070 (59404 *et al.* answer at 16 ¶ 48).  From March 11, 2015 to July 14, 2015 (126 days), the government assessed liquidated damages in the amount of $747 per day for a total of $94,122 (*id.*).  Ultimately, the total amount of liquidated damages assessed by the government was in the amount of $700,447.40 (*id.*).

The government made deductions to RBC's pay applications, Nos. 2 and 3 for administrative costs (app. supp. R4, tab 21 at 4-10).  The government retained 10% from payment of pay applications No. 5, 7, 9-19 (R4, tabs 61, 238, 241-243).  The government also assessed liquidated damages against RBC's pay applications, Nos. 23-33 (R4, tabs 244-254; app. supp. R4, tab 21).

## DECISION ASBCA No. 60851

A.  Additional Kitchen Features

RBC asserts that it is entitled to $14,989.93 for additional kitchen equipment including installation, plus 143 days of delay, overhead, and daily costs, for a total of $651,534.31 (app. br. at 45; R4, tab 196 at GR4_5339).  Specifically, RBC asserts that the government required additional changes from its approved design pertaining to the lack of a ventilation hood, hot water sanitizing equipment, and anchoring stainless steel tables (R4, tab 196 at GR4_5330).  As noted above, the RFP contained a standard kitchen equipment plan and UFC equipment list of kitchen equipment for "inclusion in all Army Reserve training center projects with kitchens" (R4, tab 99 at GR4_3105-06).  The list specifically includes a ventilation hood and a sanitizing booster heater (*id.* at 3106).  Moreover, the RJS Barber food service specifications note that the contractor was to "set in place per manufacturer's standard specifications" the stainless steel tables (GR4, tab 101 at GR4_3157; tr. 5/49-50).  Any changes to the standard kitchen equipment were required to be approved by the ACSIM-ODR project officer (R4, tab 99 at GR4_3101).  No kitchen equipment changes were ever requested by RBC or permitted (tr. 3/195, 5/35-36).

RBC did not address these issues in its post-hearing briefing, except to note that the government had not accepted the kitchen due to "alleged non-compliant and/or missing equipment" (app. proposed findings of fact ¶¶ 200-01).  At the hearing, Mr. Balcazar argued that RBC had provided a better solution to the government by installing a state-of-the-art chemical sanitizing system, rather than the hot water sanitizing equipment specified in the contract.  In RBC's opinion, the kitchen equipment that was specified was a "Ford and we gave you a Cadillac" (tr. 1/138).  We find that that the ventilation hood, hot water sanitizing equipment, and anchoring of the

stainless steel tables were required by the contract and deny this portion of RBC's claim.

B.  Additional Work Imposed for Final Acceptance Inspection (Close-out Work)

RBC asserts that it was required to perform additional work for the final acceptance inspection with direct costs of $47,864.39, plus delay and overhead costs that were concurrent with the additional kitchen equipment claim discussed immediately above (R4, tab 196 at SGR4_5339).  Specifically, RBC contends that it was required to provide an air compressor in the OMS building, edge strip the PV array, water heaters, and Buchanan perimeter fence, provide shrubs to screen water heaters, air conditioning equipment, and backflow preventers, mortar fill walk-off pads, install motion sensors at entrance doors, provide steel corner guards at the OMS building and modify door hardware in the physical readiness room (R4, tab 196 at SGR4_5333).

RBC did not address the air compressor in its post-hearing briefing.  The Unified Facilities Criteria, at specification 4-3.9.12, requires the contractor to furnish and install an air compressor (app. supp. R4, tab 38 at 160).  We hold that RBC was required by the contract to provide an air compressor and deny this portion of RBC's claim.

The government also required the installation of the additional edge strip at the PV array, solar water heaters, and the OMS perimeter fence, which RBC contends was not required by the contract (tr. 3/157-58, 4/142-43).  Section 5.9 of the contract "Miscellaneous" subsection "5.9.1 Edger" required that, "[s]hrub & perennial beds adjacent to turf areas and landscape maintenance strips shall include a metal edging system" (R4, tab 4 at GR4_364; tr. 5/83).  We find that the contract required RBC to provide the edge strip at the designated locations and deny this portion of RBC's claim.

RBC installed additional screening shrubs for water heaters and condensing units, which were not included in RBC's design and which RBC contends were not required by the contract (tr. 3/159-60, 4/143-45).  Section 5.7.7 of the contract, "Screening" required the contractor to screen "undesirable views" such as service areas and mechanical equipment (R4, tab 4 at GR4_362; tr. 5/83).  We find that the contract required RBC to provide screening shrubs at the locations in question and deny this portion of RBC's appeal.

The contracting officer found merit in RBC's claim with regard to the mortar fill for walk-off mats, and that portion of RBC's claim is not before us.  RBC contends that the government required the installation of motion sensors at entrance doors in the assembly hall and training center, which were not required by the contract (tr. 4/148).  Section 6.4.7.1.1 of the contract, "Hardware" required that the contractor:

43

> Provide two electrified entrance doors at each building
> consisting of the following minimum hardware . . .
> Locking devices shall consist of Night Latch Function Rim
> Exit Device and electric strike.

(R4, tab 4 at 372; tr. 5/84)  We find that the contract required the installation of motion sensors at the entrance doors of the assembly hall and training center and deny this portion of RBC's claim.

The government required that RBC install steel corner guards at the OMS building, which RBC contends were unnecessary additional work and expense because the precast concrete walls exceeded the minimal lateral load and would resist impact and because RBC's design included bollards that RBC contends would adequately protect the corners at issue (tr. 4/145-47).  Section 7.3.7 of the contract "Impact Loads" required that the corners be protected with steel angles or built-up plates embedded into the concrete or masonry (R4, tab 4 at GR4_382; tr. 5/84).  We find that the contract required the installation of corner guards at the OMS building and deny this portion of RBC's claim.

RBC additionally contends that the government required a hardware modification at the physical readiness room that was not required by the contract (app. proposed findings of fact ¶ 204).  RBC presented no argument at the hearing or in its post-hearing briefing other than to state that the hardware was not required by the contract.  The contracting officer found that RBC had installed a deadbolt latch in the fitness room which automatically deadlocked the room when the door was closed, rather than installing a classroom lockset that could be opened with a key from either side (R4, tab 194 at GR4_5222).  The Unified Facilities Guide § 4-2.35.4 provides that the physical readiness training room should have a "Lockset - classroom" (app. supp. R4, tab 38 at 137-38; tr. 4/147).  We find that the hardware modification was required by the contract, and that RBC failed to comply with the terms of the contract.  We deny this portion of RBC's claim.

C.  Additional Work Imposed After Final Acceptance Inspection

RBC asserts that it was required to provide a card reader programmer and to install a mirror over the sink in the male training center bathroom at a direct cost of $279.62, plus delay and overhead costs that were concurrent with the additional kitchen equipment described above (R4, tab 196 at SGR4_5334, 5339).  RBC did not address this portion of its claim at the hearing or in its post-hearing briefing.  We find that RBC has waived this portion of its claim.  *See*, *Engineering Solutions & Products*, *LLC*, 17-1 BCA ¶ 36,822

at 179,470; *cf. Watts Constructors LLC*, 20-1 BCA ¶ 37,563 at 182,387; *SmithKline Beecham*, 439 F.3d at 1319.

D.  Additional Turf Establishment Work

RBC asserts that it is entitled to $1,893.71 for reestablishing turf at the project site (app. br. at 37-38).  RBC does not dispute that the contract required it to establish and maintain the turf for a 12-month period (*id.* (citing R4, tab 4 at GR4_361)).  As detailed above, RBC contends that it was unable to maintain the turf because of a drought in Puerto Rico and associated water use restrictions.  RBC contends that the government constructively changed the contract by forcing it to perform work not required by the contract (app. br. at 37-38).  RBC contends that the drought was an "act of God" that excused its failure to perform and prevented the government from seeking damages (app. br. at 38).  RBC relies upon the contractual provision at FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) providing that "[t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages . . . if (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.  Examples of such causes include (i) acts of God" (R4, tab 4 at GR4_218).

We hold that RBC has not established entitlement to damages with regard to this portion of its claim.  RBC's theory is that the drought was an "act of God" that relieved it of the obligation to maintain the turf for 12 months, and thus, the government's enforcement of the contractual terms was a constructive change.  As an initial point, we find that RBC has not established that the drought was an "act of God" that prevented it from maintaining the turf.  RBC relies upon a Puerto Rican press release that, in RBC's translation from the original Spanish, required residents to "avoid unnecessary" watering of plants, rather than prohibiting watering (app. supp. R4, tab 67 at 6).  RBC's witnesses additionally testified that RBC was prohibited from watering the turf (tr. 4/154), but RBC did not introduce any documentary evidence of a prohibition against watering.  The government introduced testimony that there was never a prohibition against watering on the base and that RBC had stopped maintaining the turf before the drought was announced (tr. 5/89).  RBC bears the burden of proof on this claim, and we find that RBC has not established that it was prohibited from watering the turf.

Even if RBC were prohibited from watering the turf due to the drought, its citation to FAR 52.249-10 would not entitle RBC to the damages it seeks.  First, the FAR termination for default provision providing that "the Contractor [not be] charged with damages" in the event of an act of God refers not to increased costs of performance for the contractor, but rather is a limitation on the government's rights to recover liquidated damages or reprocurement costs *against* the contractor (FAR 52.249-10(b)).  Additionally, RBC has not established that it provided the written notice of delay to the contracting officer within 10 days of the start of the alleged delay

as required by the FAR (FAR 52.249-10(b)(2)).  An act of God is an excuse for failure to perform, but entitles the contractor only to an extension of time and then only, if the delays increase the time for performance of the entire contract.  *Fraya*, *S.E.*, ASBCA No. 52222, 02-2 BCA ¶ 31,975 at 157,950.  In *James L. Ferry & Son*, *Inc.*, ENG BCA No. 3996, 81-2 ¶ 15,330, a contractor incurred increased costs and delays due to a drought.  The Engineer's Board granted additional time, but held that "the contractor is still obligated to perform his original undertaking and the owner-Government is still obligated to pay him the originally-agreed price for that performance."  *Id.* at 75,918.  As RBC admits that the contract required it to plant and maintain the turf, we deny this portion of RBC's claim.

E.  Interests Accrued for Improper Deductions on Applications for Payments

In its post-hearing brief, RBC does not allege that it is entitled to interest, other than CDA interest, on the purportedly improper deductions and liquidated damages (app. br. at 38-43).  To the extent RBC asserted entitlement to prompt payment interest on amounts purportedly due prior to the date its claim was filed (R4, tab 196 at GR4_5336), this portion of its claim is waived.  The government has not asserted a defense to statutory CDA interest, so we find that there is no dispute to resolve regarding interest.

F.  Improper Deductions from Applications for Payments

RBC asserts that the government improperly withheld funds from its applications for payment and improperly assessed liquidated damages.  In the section that follows, we address the number of days of delay established by RBC that necessarily determines the appropriateness of the government's withholding.

RBC additionally, challenges the government's assessment of reduced liquidated damages.  The government assessed 479 days of liquidated damages, through March 10, 2015, at $1,330 per day for a total of $637,070 (R4, tab 194 at GR4_5237).  The government took partial occupancy of the facility on March 10 and assessed liquidated damages at a reduced rate of $747 per day from March 11, 2015, to July 14, 2015 (126 days), for a total of $94,122 (*id.*).  RBC contends that the government's partial occupancy of the facility constitutes "acceptance" of the facility and prevents the government from seeking liquidated damages after March 10, 2015 (app. br. at 43).  The government, relying upon FAR 52.236-11, USE AND POSSESSION PRIOR TO COMPLETION (APR 1984), disputes that it "accepted" the facility in March of 2015 and contends that it is permitted to seek lower liquidated damages (gov't resp. br. at 62).  The government is correct that the contract contains FAR 52.236-11 (R4, tab 4 at GR4_206-07), and that the clause provides that the government may take possession of completed or partially completed portions of the work prior to completion and that the government's possession or use does not constitute acceptance.  FAR 52.236-11(a); *Valco Constr. Co.*, ASBCA Nos. 47909, 48313, 97-1 BCA ¶ 28,743 at 143,469.  Thus, we hold that the government is, subject to proof of contractor delay, entitled to collect

liquidated damages for the period after taking partial occupancy in March of 2015. We are not aware of any law, regulation, or contractual provision preventing the government from assessing a daily liquidated damages rate that is *lower* than the rate specified in the contract. Furthermore, we fail to see how RBC is prejudiced by the assessment of liquidated damages at a *lower* rate. With the exception of the withholding calculations to be addressed below, appeal ASBCA No. 60851 is denied.

VII. Delay Calculations

RBC presented expert witness testimony from Mark Doran, President and Owner of Contract Solutions, regarding its schedule delay analysis. Mr. Doran performed an as-planned/as-built analysis and determined that the government was responsible for 707 days of compensable delay. After considering the government's 102 day non-compensable time extension for the asbestos issue, Mr. Doran found that RBC was entitled to 605 additional days, based on 6 separate delay periods (app. supp. R4 tab 117, tr. 2/98). Mr. Doran found entitlement to 101 days of delay between the notice to proceed and release of the site and foundation package, due to the government's slow review of project design documents including the fire cistern (tr. 2/99-100). Mr. Doran's second delay period comprised the period of July 26, 2012, through the completion of asbestos abatement, with 123 days of delay attributed to the government and 7 days of delay attributed to RBC (tr. 2/107; app. supp. R4, tab 117 at 10-12). In his third delay period, Mr. Doran found that RBC recovered 37 days of delay between January 28, 2013 and the start of the built-up roofing delay (tr. 2/113, 115; app. supp. R4, tab 117 at 12-13). In his fourth period of delay, Mr. Doran found 232 days of delay, concurrent with the delay at the training center, from the start of the roofing delay to the start of electrical installation at the OMS building (tr. 2/120-21; app. supp. R4, tab 117 at 18). Mr. Doran's fifth period of analysis, from the start of the electrical installation to the date of substantial completion, September 18, 2014, saw RBC recover 11 days of delay (tr. 2/131-33; app. supp. R4, tab 117 at 19). Mr. Doran's sixth period runs from substantial completion to the government's acceptance of the kitchen in the assembly building and involves 299 days of delay (tr. 2/ 133-35; app. supp. R4, tab 117 at 21).

The government presented the expert witness testimony of Stuart Ockman as a scheduling expert. Mr. Ockman performed a time-impact analysis, finding 8 controlling time impacts, with RBC responsible for all delays with the exception of 47 days for the asbestos pipe (R4, tab 285 at GR4_7425; tr. 7/157, 164). Mr. Ockman testified that RBC was responsible for 97 days of delay due to the late submittal of the certified final site and foundation design package (R4, tab 285 at GR4_7399). Mr. Ockman additionally found that RBC was responsible for 43 days of delay due to its late start of mobilization (*id.* at GR4_7400). He found that RBC was responsible for 6 additional days of delay due to a late start of clearing and grubbing (*id.* at GR4 7401). Mr. Ockman found that there were 70 days of delay due to the late finish of the assembly hall backfill and he

apportioned 47 of these days to the government due to the discovery of asbestos, but assigned 23 days of delay to RBC (*id.* at GR4_7401-05).

Mr. Ockman assigned 35 days of delay to RBC for the late start of the assembly hall roofing (*id.* at GR4_7405-07). He similarly assigned 106 days of delay to RBC for the slow progress with architectural finish work and late pre-final inspection (*id.* at GR4_7407-08). Mr. Ockman assigned 23 days of delay to RBC for late preparation for government pre-final inspection (*id.* at GR4_7408). Finally, Mr. Ockman assigned 201 days of delay to RBC for the late finish of punch-list items and clean-up work (*id.* at GR4_7409).

As illustrated above, the experts disagreed with regard to all but 47 of the roughly 600 days of delay at issue. In addition, the experts disagreed regarding methodological issues not relevant to our determination of this appeal. Finally, the experts also disagreed regarding the critical path for the project. According to Mr. Doran, the critical path for the project shifted to the OMS building in July or August of 2013 while Mr. Ockman concluded that the OMS building was never on the critical path and that the critical path was always through the assembly building.

<u>DECISION</u>

In the decision above, we held that RBC had established that the government caused the following delays: 119 days for the fire cistern, of which 88 days were concurrent with RBC-caused delays; 116 days of delay for the asbestos claim; 15 days of delay, plus 31 days of concurrent delay, due to extended review of the RBC's built-up roofing submittals, and 39 days of delay due to extended review of RBC's standing seam roofing submittals.

Both experts agree that the fire cistern was on the as-built critical path (app. supp. R4, tab 117 at 8-9; R4, tab 285 at GR4_7389). Mr. Doran's report finds that RBC was delayed 101 days for the site and foundation package delays, based on the impact on the critical path, rather than simply counting the number the days of possible delay (app. supp. R4, tab 117 at 7-9). Mr. Ockman similarly determined that the schedule was impacted by 101 days, although he attributed the delay to RBC (gov't resp. br. at 57). We hold that RBC is entitled to 31 compensable days of delay and 70 days of concurrent delay related to the fire cistern.

Both experts similarly treat the discovery of asbestos as impacting the critical path for the project. Thus, we find that RBC is entitled to 116 days of compensable delay for the asbestos issue. The government already awarded RBC 102 non-compensable days of delay so only the additional 14 days should be removed from the allowable liquidated damages due to the government.

For the roofing delays, the experts disagree as to whether the OMS building was on the critical path. We found a 15-day delay due to extended review of the RBC's built-up roofing submittals, and 39 days of delay due to extended review of RBC's standing seam roofing submittals. However, these delays are potentially concurrent. Mr. Doran found that the critical path shifted to the OMS building in July or August of 2013. By this logic, the 15-day submittal delay on the training center was still on the critical path and would be compensable. The critical path then shifts to the OMS building, during the period of the OMS building layout change. We find that the critical path shifted to the OMS building. The one day of delay ending on September 25, 2013, and the nine days of delay ending on January 8, 2014, for an extended review of the standing seam roofing submittals are on the critical path and compensable and the 31 days of concurrent delay within the built-up roofing review is also on the critical path. The same is true for the 29 days of extended review time from January 14, 2014, to February 26, 2014. *See*, *e.g.*, *Insulation Specialties*, *Inc.*, ASBCA No. 52090, 03-2 BCA ¶ 32,361 at 160,100-01. Thus, we find that RBC is entitled to 39 days of compensable delay for the extended review of the standing seam roofing submittal.

In summation, RBC is entitled to 302 days of delay, with 101 days being concurrent and non-compensable and 201 days being compensable. The government previously assessed 479 days of liquidated damages at the full contractual rate of $1,330 per day, after granting RBC 102 non-compensable days for the asbestos. Thus, we find that the government is entitled to 279 days (479 days claimed + 102 days previously granted – 302 days of delay calculated) of liquidated damages at the rate of $1,330 per day or $371,070. We sustain the government's assessment of 126 days of delay at a reduced rate of $747 per day for a total of $94,122. This results in a total liquidated damages of $465,192.

## CONCLUSION

Appeal ASBCA No. 60050 is sustained and appeals ASBCA Nos. 59404, 60277, and 60851 are sustained in part. These appeals are returned to the parties for negotiation of quantum consistent with this decision. Appeal ASBCA No. 59962 is denied.

Dated: July 9, 2020

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

W
I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59404, 59962, 60050, 60277, 60851, Appeals of RBC Construction Corp., rendered in conformance with the Board's Charter.

Dated: July 9, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals